# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | § | |
| THE STATE OF TEXAS *ex rel*. | § | |
| KRISTIAN NEWBY, | § | |
| | § | |
| Plaintiffs/Relator, | § | |
| | § | CIVIL ACTION NO. 1:18-cv-394 (MAC) |
| V. | § | |
| | § | |
| RICELAND HEALTHCARE SYSTEM, LLC; | § | **DEMAND FOR JURY TRIAL** |
| WINNIE COMMUNITY HOSPITAL, L.L.C., | § | |
| d/b/a BRIDGEPOINTE HEALTHCARE, d/b/a | § | |
| RICELAND CLINIC, | § | **FILED UNDER SEAL** |
| d/b/a RICELAND MEDICAL CENTER, d/b/a | § | PURSUANT 31 U.S.C. § 3730 |
| RICELAND DIAGNOSTIC IMAGING | § | |
| CENTER, d/b/a RICELAND ODC, | § | |
| d/b/a RICELAND SURGERY CENTER, d/b/a | § | |
| RICELAND CLINIC HULL-DAISETTA; | § | |
| RICELAND MEDICAL HOLDING | § | |
| COMPANY, LP f/k/a STARCO | § | |
| MANAGEMENT, LP; HOUSTON PREMIER | § | |
| RADIOLOGY CENTER, INC.; | § | |
| MUHAMMAD TAHIR JAVED; | § | |
| MOHAMMED DANISHMUND; | § | |
| JULIE HAIRE; CINDY WAINWRIGHT; | § | |
| GREGORY L. GRAY; ANGELA M. RAINEY; | § | |
| DAYLON D. LONG; DALE W. BROCK; | § | |
| DREW BARSCH; and TRANSCURE LLC | § | |
| | § | |
| Defendants. | § | |

_____

## RELATOR KRISTIAN NEWBY'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, THE PROGRAM FRAUD CIVIL REMEDIES ACT, THE TEXAS MEDICAID FRAUD PREVENTION ACT, THE TEXAS MEDICAID ASSISTANCE PROGRAM, TEXAS PATIENT SOLICITATION ACT AND THE COMMON LAW

This is an action brought on behalf of the United States of America and the State of Texas

by *Qui Tam* Relator Kristian Newby ("Relator" or "Ms. Newby"), by and through her attorney,

against Defendants (*see* Part III), pursuant to the *qui tam* provisions of the federal Civil False

Claims, 31 U.S.C. § 3729, *et seq*., as amended, the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code Ann. § 36.001, *et seq*.,[1] the Texas Human Resource Code – Medical Assistance Program ("MAP"), Tex. Hum. Res. Code Ann. § 32.039(b)(1-a) and the Texas Patient Solicitation Act ("TPSA"), Tex. Occ. Code Ann. § 102.001 *et seq.* (collectively "Texas Law") to recover all damages established by the False Claims Act ("FCA") and penalties and other remedies established by Texas Law.

This case has three main issues associated with Defendants' unlawful acts and knowing and intentional conduct in violation of the False Claims Act and Texas Law:

    a.   Knowingly and intentionally engaging in unlawful acts and violating the attestation requirements for claims submitted to Medicare and Medicaid by the individual Defendants, which led to the knowing and intentional inaccurate billing/coding and the subsequent submission of false claims for payment from Medicare, Medicaid and private payors, and the knowing and intentional retention of the payments from the government;

    b.   Knowingly and intentionally engaging in unlawful acts and rendering medical services that were either worthless, nonexistent, lacked medical necessity and/or caused patient harm; and

    c.   Knowingly and intentionally engaging in unlawful acts and conspiring to participate in a scheme to solicit or provide remuneration either in cash or in kind, direct or indirect, covert or overt -  in exchange for referring, arranging, purchasing, or ordering of any good, service, facility or item in violation of the Anti-Kickback

Statute, 42 U.S.C. § 1320a-7b (the "AKS"), the Medicare/Medicaid Self-Referral

Statute, 42 U.S.C. § 1395, *et seq*. (the "Stark Law") and Texas Law.

Overall, the Defendants knowingly submitted various claims to the government, which they knew were false. The payments received were then knowingly retained, instead of being returned to the government's coffers.

## I. <u>PRELIMINARY STATEMENT</u>

1.      Medicare, Medicaid, TRICARE, CHAMPVA and other federal, state and local programs (collectively "Government Programs") are designed to provide needed health care to save and improve the lives of almost 100 million Americans. Those Americans and Texans covered by these programs include active duty members of the armed forces of the United States and their families, veterans and retirees, members of the National Guard, men and women over 65, men and women under 65 with certain disabilities, anyone afflicted with serious kidney failure, indigent Americans and children in low income families, among others. Eligible men, women and children depend on these taxpayer-funded programs for their health and well-being.

2.      Tragically, there are daily attempts by unscrupulous individuals and corporations to divert these taxpayer dollars for their own gain and away from their intended goal— to provide medical care and save lives. The Center for Medicare and Medicaid Services ("CMS") estimated in 2014 some $60 billion of American taxpayer money, or more than 10 percent of Medicare's total budget, was lost to fraud, waste, abuse and improper payments.[2] This case involves such schemes.

---

[2] Jim Avila, Serena Marshall and Gitika Gaul, *Medicare Funds Totaling $60 Billion Improperly Paid, Report Finds*, (ABC News television broadcast, July 23, 2015), found at

3.      *Qui tam* Relator Kristian Newby, both individually and on behalf of the United States of America and the State of Texas, brings this action to recover from Defendants damages, penalties, attorneys' fees and other remedies for Defendants' violations of 31 U.S.C. §§ 3729, *et seq*. (the "False Claims Act"), the Texas Medicaid Fraud Prevention Act, Tex. Human Res. Code §§36.001, *et. seq.*, , Tex. Hum. Res. Code Ann. § 32.039. *et seq*. and the Texas common law.  The exploitation by Defendants of these federal and state health care programs included, but was not limited to, the following knowing and intentional activities: the submission by Defendants of false claims, attestations and certifications to federal and state government agencies regarding medical services provided by Defendants, including but not limited to: upcoding; the systematic submission of claims for services performed without a physician's order and/or the patient's consent; the regular submission of claims for services that were never provided; the failure to document medical necessity and the falsification of patient documentation; violations of the AKS and Stark Law (e.g., the waiving of copayments and deductibles in order to attract more patients whose health care was being paid for by state and federal governments, remuneration to providers either in cash or in kind above fair market value where one purpose was to induce referrals); billing at excessive rates; and the knowing and intentional retention of over-payments from government payors. Defendants have engaged in these practices since at least 2012 and possibly before. The Defendants knowingly defrauded the United States Government and the State of Texas, and knowingly retained overpayments made to them by governmental agencies.[3]

---

https://abcnews.go.com/Politics/medicare-funds-totaling-60-billion-improperly-paid-report/story?id=32604330 (last viewed May 25, 2019).

[3] *See* e.g. Exhibit 1.

4.      Further, Defendants Riceland Healthcare Services, LLC, Winnie Community Hospital, LLC, Muhammad Tahir Javed, Mohammed Danishmund and Julie Haire engaged in prohibited retaliation under 31 U.S.C. § 3730(h) when they terminated Relator because of lawful acts she performed over the course of several weeks when she brought the fraudulent schemes that form the basis of this lawsuit directly to the attention of the owners and executive team of the Defendant corporations and her supervisors.

## II. JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the claims brought under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1331. This Court has jurisdiction over the claims brought under the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, pursuant to 28 U.S.C. §1331.

6.      This Court has supplemental jurisdiction over the claims brought by the State of Texas pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) because that section of the False Claims Act provides that an action under Section 3730 "may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant, can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process.  During all relevant periods the Defendants resided and/or transacted business in the Eastern District of Texas and many of the violations occurred within this judicial district.  Specifically, the Eastern District of Texas is where the various fraudulent schemes were perpetrated on the Federal Government and the State of Texas, commencing before Relator's spring 2018 start date, and continuing throughout her

employment and presently continuing, despite her efforts to comply with the relevant laws and regulations.

8. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the Eastern District of Texas is the judicial district in which many of the Defendants can be found, reside, transact business and have their principal place of business, and it is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

9. Relator brings this action based on her direct knowledge and on facts that have been disclosed and/or admitted to her. To the best of Relator's knowledge, there have been no public disclosures of the allegations and transactions contained herein, as the term "public disclosure" is defined under 31 U.S.C. § 3730. To the extent there has been a public disclosure of any of Relator's allegations herein, she is an original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B). Relator possesses direct and independent knowledge of the information on which the allegations are based. Relator also voluntarily disclosed this information to the Government. *See* 31 U.S.C. § 3730(e)(4)(B).

10. As required by the False Claims Act, the TMFPA, MAP and the TPSA, Relator has provided to the Attorney General of the United States, the United States Attorney for the Eastern District of Texas and the Attorney General of the State of Texas, prior to the filing of both the Complaint, First Amended Complaint and this Second Amended Complaint, a disclosure statement of all related material evidence and information. These assertions are supported by material evidence known to the Relator at the time of this filing, establishing the Defendants' legal responsibility for those false claims.

### III. PARTIES

**Relator and Government Plaintiffs**

11.    Relator Kristian Newby ("Ms. Newby" or "Relator") is a citizen of the United States of America who resides in Beaumont, Jefferson County, Texas. Ms. Newby was an employee of Defendant Winnie Community Hospital, LLC from March 5, 2018 through July 24, 2018. In the course and scope of her employment Ms. Newby discovered that Defendants had knowingly and intentionally engaged and continued to engage in a series of schemes to defraud the United States and the State of Texas that began well before her first day of work. Relator alleges that from at least 2012 through her termination on July 24, 2018, those schemes to defraud the federal and state governments and engage in unlawful acts included the following practices, among others: (a) upcoding; (b) billing for patient visits that never took place or were worthless; (c) billing for patient visits when no physician ordered or requested the visit; (d) maintaining no or inadequate medical documentation to establish the services provided were medically necessary;(e) providing medical services that were not medically necessary; (f) fraudulently utilizing national provider identifiers ("NPIs"); (h) misrepresenting that Medicare and Medicaid reimbursement was appropriate through Defendant Riceland Medical Center, a critical access hospital, by using CMS Form UB-04 instead of using CMS Form 1500 for services that were actually performed in an ambulatory surgery center ("ASC"), outpatient diagnostic center or outpatient radiology center; (i) manipulation of codes in order to obtain a higher reimbursement or overturn a denied Medicare, Medicaid, TRICARE, CHAMPVA or private payer claim; (j) filing factually and legally false claim submissions from three diagnostic imaging centers (Outpatient Diagnostic Clinic (Beaumont, Texas), Riceland Imaging (Beaumont, Texas) and Houston Premier Imaging (Houston, Texas)); (h) systematically not collecting deductibles or copayments from

patients whose care was paid for by the United States and/or the State of Texas in order to attract more patients for whose care the Defendants could bill the United States or the State of Texas; (i) paying kickbacks and other forms of illicit remuneration to providers and/or referral sources; and (j) knowingly retaining overpayments made by the governments.

12.     The United States is a Plaintiff which brings this action on behalf of the Department of Health and Human Services ("HHS"), the Department of Defense ("DOD"), the United States Department of Veterans Affairs ("VA"), the Center for Medicaid and Medicare Services ("CMS"), and the federal Office of Personnel Management.

13.     The State of Texas is a Plaintiff for which recovery is sought for damages to its Medicaid program.

14.     The United States and the State of Texas are collectively referred to as the "Government."

**Defendants**

15.     Defendant, Riceland Healthcare System, LLC is a Texas limited liability company with its principal place of business located in the Beaumont Division of the Eastern District of Texas at 85 Interstate 10 N., Suite 111, Beaumont, Texas 77707-2500. Defendant transacts business in the Eastern District of Texas and across state lines. Riceland Healthcare System, LLC's registered agent for service of process is: Muhammad Tahir Javed; 85 Interstate 10 North, Suite 111, Beaumont, Texas 77707-2500.

16.     Defendant, Winnie Community Hospital, LLC ("WCH"), d/b/a Bridgepointe Healthcare, d/b/a Riceland Clinic, d/b/a Riceland Medical Center, d/b/a Riceland Diagnostic Imaging Center, d/b/a Riceland ODC, d/b/a Riceland Surgery Center, d/b/a Riceland Clinic Hull-Daisetta, is a Texas limited liability company with its principal place of business located in the

Beaumont Division of the Eastern District of Texas at 85 Interstate 10 North, Suite 111, Beaumont, Texas 77707-2500. This Defendant operates under a variety of names across Southeast Texas, doing business as BridgePointe Healthcare, Riceland Clinic, Riceland Medical Center, Riceland Diagnostic Imaging Center, Riceland ODC, Riceland Surgery Center, and Riceland Clinic Hull-Daisetta, among others. This Defendant's National Provider Identifier is 1295781227.[4] Winnie Community Hospital, LLC ("WCH") was initially formed on February 2, 2001 in the State of Texas. The majority shareholder, Frontier Healthcare Group, LLC ("Frontier"), which was formed in Oklahoma, held at least 99% of the cancelled membership units of WCH. On December 17, 2012, both WCH and Frontier filed for bankruptcy under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* On January 23, 2014, a Trustee was appointed for both WCH and Frontier. According to WCH and Frontier's books and records, which were filed as part of *In re: Winnie Community Hospital, L.L.C.*, Case No. 12-46841-dml-11 (Bankr. N.D. Tex. 2014), it appears that the hospital was not profitable for a number of years and was subject to ongoing IRS penalties and interest. Coon Bayou Lenders ceased allowing WCH and Frontier to borrow funds under its existing line of credit. Subsequently, an auction was held by the Trustee and Starco Management, LP emerged as the successful bidder, of which Defendant Muhammad Tahir Javed is a majority owner, agreeing to acquire the entities for $3,200,000.00.[5]

---

[4] A chart showing the National Provider Identifier ("NPI") for the various entities under which Defendant was doing business is attached as Exhibit 2.

[5] The Winnie Stowell Hospital District was instrumental in both "ensuring that the Winnie Community Hospital remained open and was able to keep its designation as a "Critical Access" facility, which would enable a future owner of the hospital to receive more favorable

17.     Defendant Winnie Community Hospital, LLC and all of the entities and assumed names that it was operating under, knowingly and intentionally falsified the following: physician's forms, medical records (which in some cases did not exist) required to substantiate the medical necessity of services provided, certifications, attestations and claims submissions forms from and to government payors, and retained overpayments from a variety of government entities in violation of the federal False Claims Act and Texas Law. Defendant and its agents, servants and/or employees also knowingly provided kickbacks to induce referrals. These illicit practices resulted in substantial monetary gains for the Defendants and Mohammad Tahir Javed in particular. According to the American Hospital Directory, Riceland Medical Center (CMS Certification Number: 451328), is a critical access hospital with 25 beds and total patient revenue for FY 2017 totaling $157,051,989.[6] When compared to other critical access hospitals in the State of Texas, this revenue is exceedingly high.[7]

---

reimbursement rates from Medicare" and "invest[ing] in Riceland Hospital's (formerly known as Winnie Community Hospital) services and infrastructure so that the District's residents and needy will have access to a better healthcare facility." *See*, http://wshd-tx.org/about/ (last visited Dec. 9, 2018).

[6] American Hospital Directory, *Riceland Medical Center*,

https://www.ahd.com/free_profile/451328/Riceland_Medical_Center/Winnie/Texas/ (last visited Dec. 5, 2018).

[7] American Hospital Directory, *UT Health Quitman*,

https://www.ahd.com/free_profile/451380/UT_Health_Quitman/Quitman/Texas/ (last visited Dec. 5, 2018)(indicating $80,569,260 in total patient revenue for 2017).

18.     Defendant WCH transacts business in the Eastern District of Texas and across state lines. Relator alleges that Defendant retaliated against and ultimately discharged her for her efforts to stop False Claims Act violations. Winnie Community Hospital, LLC's registered agent for service of process is: Muhammad Tahir Javed; 85 Interstate 10 North, Suite 111, Beaumont, Texas 77707-2500.

19.     Defendant, Riceland Medical Holding Company, LP f/k/a Starco Management, LP is a Texas limited partnership with its principal place of business located at 2270 Avalon St., Beaumont, Texas 77707. Riceland Medical Holding Company, LP's registered agent for service of process is: Muhammad Tahir Javed; 2270 Avalon St., Beaumont, Texas 77707.  Defendant transacts business in the Eastern District of Texas and across state lines.

20.     Defendant, Houston Premier Radiology Center, Inc. is a Texas corporation with its principal place of business located at 12853 Gulf Freeway, Houston, Texas 77034.  Houston Premier Radiology Center, Inc.'s registered agent for service of process is: Salima Dhalla; 2202 South Century Court, Friendswood, Texas 77546.

21.     Defendant, Muhammad Tahir Javed[8] is an individual who claims to be the Chief Executive Officer of all the corporate defendants named in this lawsuit. Based on Relator's personal observations, he had actual knowledge of the fraudulent schemes detailed in this pleading. Defendant resides in Beaumont, Texas, transacts business in the Eastern District of Texas and across state lines from his corporate office located in the Beaumont Division of the Eastern District

---

[8] On different documents, the spelling of Defendant Muhammad Tahir Javed's name is inconsistent.

of Texas, and may be served personally at his place of business: Riceland Healthcare System, LLC; 85 Interstate 10 North, Suite 111, Beaumont, Texas 77707-2500.

22.     Defendant, Mohammed Danishmund is the Chief Financial Officer of many of the corporate defendants named in this lawsuit. Based on Relator's personal conversations with this Defendant and her observations, Defendant Danishmund had actual knowledge of, and knowingly participated in, the fraudulent schemes detailed in this pleading. Defendant resides in Beaumont, Texas, transacts business in the Eastern District of Texas and across state lines from his corporate office located in the Beaumont Division of the Eastern District of Texas, and may be served personally at his place of business: Riceland Healthcare System, LLC; 85 Interstate 10 North, Suite 111, Beaumont, Texas 77707-2500.

23.     Defendant, Julie Haire is described on the Riceland Healthcare website as the "Accounting Manager Fort Worth," but was known to Relator as the Financial Director. Based on Relator's personal conversations and email exchanges with this Defendant and her observations, this Defendant had actual knowledge of, and knowingly participated in, the fraudulent schemes detailed in this pleading. Although she primarily works in the Fort Worth, Texas office, Defendant Haire regularly came to the Beaumont corporate offices of Riceland Healthcare Services and transacted business in the Eastern District of Texas and across state lines. Defendant may be served personally at her place of business: Riceland Healthcare-Fort Worth; 8851 Camp Bowie W. Boulevard, Suite 285, Fort Worth, Texas 76116.

24.     Defendant, Cindy Wainwright (also known as Cindy Wainwright-Brown) is described on the Riceland Healthcare website as the "Director of Billing Operations." In her emails, however, she held herself out as "Director of Revenue Cycle, Riceland Healthcare (formerly known as Winnie Community Hospital)". Based on Relator's personal conversations

and email exchanges with this Defendant and her personal observations of the conduct of this Defendant, Cindy Wainwright had actual knowledge of, and knowingly participated in, the fraudulent schemes detailed in this pleading. Although she primarily works in the Fort Worth, Texas office, Defendant Wainwright regularly came to the Beaumont corporate offices of Riceland Healthcare Services, and transacted business in the Eastern District of Texas and across state lines. Defendant may be served personally at her place of business: Riceland Healthcare-Fort Worth; 8851 Camp Bowie W Boulevard, Suite 285, Fort Worth, Texas 76116.

25.    Defendant, Gregory L. Gray is a nurse practitioner who, at all relevant times, was employed by one or more of the corporate Defendants named in this lawsuit. On information and belief Defendant Gray's national provider identifier is 1245588763. Based on Relator's personal conversations and email exchanges with this Defendant, her review of documents, her conversations with witnesses and her personal observations of the conduct of this Defendant, Gregory Gray knowingly and actively participated in some of the fraudulent schemes detailed in this pleading. This Defendant transacts business in the Eastern District of Texas and across state lines. Defendant Gray resides in the Eastern District of Texas, Beaumont Division, and may be served personally at his residence: 850 CR 4472, Warren, Texas TX 77664.

26.    Defendant, Angela M. Rainey is a nurse practitioner who was, at all relevant times, employed by one or more of the corporate defendants named in this lawsuit. On information and belief, Defendant Rainey's national provider identifier is 1780127738. Based on Relator's personal conversations with this Defendant and her review of documents, Angela M. Rainey knowingly and actively participated in some of the fraudulent schemes detailed in this pleading. This Defendant transacts business in the Eastern District of Texas and across state lines. She may be served personally at her residence: 2001 Central Dr., Beaumont, Texas 77706-2807.

27.     Defendant, Daylon D. Long is a nurse practitioner who was, at all relevant times, employed by one or more of the corporate defendants named in this lawsuit. On information and belief Defendant Long's national provider identifier is 1942696398. Based on Relator's personal conversations with this Defendant and her review of documents, Daylon Long knowingly and actively participated in some of the fraudulent schemes detailed in this pleading. This Defendant transacts business in the Eastern District of Texas and across state lines. Defendant Daylon Long may be served personally at his residence: 1400 CR 715, Buna, Texas 77612-6200.

28.     Defendant, Dale W. Brock is a nurse practitioner who was, at all relevant times, employed by one or more of the corporate defendants named in this lawsuit. On information and belief Defendant Brock's national provider identifier is 1922055292. Based on Relator's personal conversations with this Defendant and her review of documents, Dale W. Brock knowingly and actively participated in some of the fraudulent schemes detailed in this pleading. This Defendant transacts business in the Eastern District of Texas and across state lines. Defendant Dale W. Brock may be served personally at his residence: 1455 CR 184, Liberty, Texas 77575.

29.     Defendant, Drew Barsch was at all relevant times personally in charge of billing for Riceland Imaging Center, Outpatient Diagnostic Center and Houston Premier Radiology. Based on Relator's conversations with witnesses and her review of documents, it appears Drew Barsch knowingly and actively participated in some of the fraudulent schemes detailed in this pleading. Defendant Barsch billed for imaging services in Centrix, which went to ePREMIS® (a system that has a claim clearing house component). Defendant Cindy Wainwright would subsequently access ePREMIS® and release the claims to government and private payors for payment.  Defendant transacts business in the Eastern District of Texas and across state lines.

Defendant Drew Barsch may be served personally at his residence: 19917 Mid Bark Pass, Round Rock, Texas 78664-4012.

30.    Defendant, Transcure LLC ("Transcure") handled much of the billing for the services performed by the individual and corporate health care providers associated with Riceland Healthcare Services and Winnie Community Hospital, LLC. Accredited Billing and Consulting, LLC ("AB&C"), Healthrix, LLC ("Healthrix")[9] and Transcure were the three billing entities for all claims, except for the following imaging centers: Riceland Imaging Center, Outpatient Diagnostic Center and Houston Premier Radiology Center. Supervised by Qaiser Raza, Transcure processed all of the claims for the Riceland Surgery Center and, in June 2018, eventually assumed the billing and claims processing for AB&C. During the merger of AB&C and Transcure, Qaiser Raza assumed the position at the helm of both companies. After AB&C ceased its operations, the staff went to Transcure, with the exception of Azeem Gillani, who, to the best of Relator's knowledge, was terminated. Transcure LLC is a foreign limited liability company located at 2/26 Shadab Colony, Temple Road, Lahore 54000, Pakistan and registered to do business in the state of New Jersey, with its U.S.A. home office located at: 850-B, Woodbridge Center Dr.; Woodbridge, New Jersey 07095. Transcure LLC is partially owned by Defendant Muhammed Tahir Javed and Defendant transacts business in the Eastern District of Texas and across state lines.

---

[9] On March 3, 2017, Healthrix Billing, LLC, a Texas Limited Liability Corporation, was created by Defendant Danismund and Fred Farooqi, the owner of HealthRix, LLC.

# IV. <u>APPLICABLE LAW</u>

### <u>*The False Claims Act*</u>

31.     The False Claims Act ("FCA") prohibits false and/or fraudulent claims to government programs. A person or entity violates the FCA when, among other things, that person or entity knowingly presents or causes to be presented to the United States a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or conspires to defraud the Government by getting a false or fraudulent claim allowed or paid. The FCA attaches liability not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.

32.     Three provisions of the False Claims Act are at issue in this case.

    a.     Section 3729(a)(1)(A) creates liability for "any person who … knowingly presents, or causes to be presented, false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

    b.     Section 3729(a)(1)(B) creates liability for "any person who … knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).

    c.     Section 3729(a)(1)(G), known as the "reverse false claims" provision, creates liability for "any person who … knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to … the Government." *Id.* § 3729(a)(1)(G).  *See also United States ex rel. Capshaw v. White*, 2018 WL

6068806; United *States of America ex rel. Chris Riedel v. Boston Heart Diagnostics Corporation*, Case No. 12-1423 (RBW), Doc. 48 (D.D.C. 2018).

33.    Just as the initial Complaint set forth, the additional substantiation provided in this First Amended Complaint constitutes more than a "formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

34.    As the FCA's legislative history illustrates, "[c]laims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program."[10] There are three broad categories of claims: (1) factually false; (2) legally false; and (3) reverse false claim. *Kane v. Healthfirst, Inc*., 2015 WL 4619698 (S.D.N.Y. Aug. 3, 2015) (highlighting the sixty-day rule, 81 Fed Reg. 7653 (Feb. 12, 2016), and the FCA reverse false claim doctrine, 31 U.S.C.  3729(a)(1)(G)). A factually false claim is defined as an "incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001). By way of contrast, legally false claims are predicated on an express or implied false certification of compliance with a regulation, statute or contract term. This category is more complicated and has resulted in one of the most controversial debates on the proper scope of FCA liability. Express false claim cases have been accepted by District Courts without controversy. In *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) (hereinafter "*Escobar*"), the United States Supreme Court resolved a split in the Circuit Courts as to whether an implied false certification claim was permissible. The Court held that the "implied" certification theory constitutes a viable basis for a cause of action under the False Claims Act. The caveat – "that any

---

[10] S. REP. No. 345, 99th Cong., 2d Sess. 9 (1986), *reprinted in* 1986, U.S.C.A.A.N. 5266, 5274.

statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.*

35.    Compliance with relevant regulations is material to the government's decision to pay claims for medical services. "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed.'" *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995); cited by *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989, 1999 (2016)). In *United States of America ex rel. Capshaw v. Bryan L. White, M.D. and Suresh G. Kuman, R.N.*, 2018 WL 6068806, at *4 (N.D. Tex. Nov. 20, 2018), the United States District Court for the Northern District of Texas (Dallas Division) opined that "AKS violations are not 'garden variety breaches of contract or regulatory violations' that the Supreme Court sought to shield from the wrath of the FCA. *Escobar*, 136 S.Ct. at 2003. They are serious, consequential, felony transgressions of law that the Government actively enforces. Every indication is that this is precisely the kind of violation the FCA is supposed to reach." *See also United States v. Berkeley Heartlab, Inc.*, 2017 WL 6015574 at *2 (D.S.C. Dec. 4, 2017) (holding "AKS compliance is material to payment decisions in all cases."). In *United States ex rel. Hale v. Rotech Healthcare Inc.,* No.  4:14-cv-545 (E.D. Tex. 2018), Rotech admitted it had "engaged in a systematic scheme to defraud the United States and the Plaintiff-States by fraudulently billing government-funded health care programs for respiratory equipment and services that were medically unnecessary, never provided and/or otherwise billed in violation of the rules of Medicare, Medicaid and other government-funded health care programs." Their actions were deemed material. Here, the individual Defendants' specific actions, directives, oversight and

control is evidence that Defendants knew of and approved of the fraudulent activities alleged herein. *United States ex rel. Hebert v. Dizney*, 295 Fed. Appx. 717, 722 (5th Cir. 2008).

36.    To show that a person or entity acted "knowingly" under the False Claims Act, it must be proven that, with respect to information, the person or entity (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. It is not necessary to prove that the person or entity had the specific intent to defraud the United States. 31 U.S.C. § 3729(b)(l).

37.    Under the False Claims Act, the United States is entitled to recover three times the amount of damages which the Government sustains because of the false claims and a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 for each violation of the statute that occurred prior to November 2, 2015 and not less than $11,181 and not more than $22,363 for violations that occurred after November 2, 2015.

### *The Texas Medicaid Fraud Protection Act, Medicaid Assistance Program and Patient Solicitation Act*

38.    The Texas Medicaid Fraud Protection Act ("TMFPA"), the Medicaid Assistance Program and the Patient Solicitation Act have some similarities to the False Claims Act. Under the False Claims Act, liability attaches to a defendant who knowingly makes or causes to be made a false statement on an application for payment under the Medicaid program and to a defendant who knowingly makes or causes to be made a false statement concerning information required by federal or state laws pertaining to Medicaid. Both allow a person having information regarding a false or fraudulent claim against the State to bring an action for herself on behalf of the State and to share in any recovery.

39.    The TPSA, in addition to being broader in scope than the federal AKS because it includes private insurance companies, may form the basis of a violation under the TMFPA. Because of the subject matter of the TMFPA, MAP and the TPSA, these laws are read *in pari materia* with each other. Civil penalties are also available.

40.    The interconnectivity of these Texas laws are as follows: the TMFPA §§ 36.101, 36.110 has a provision which enables an action by a private person, as well as recovery. TMFPA § 36.002(13) prohibits a person from knowingly engaging in conduct that constitutes a violation under MAP § 32.039(b). MAP § 32.039(b)(1-a) prohibits engaging in conduct that violates the TPSA, leads to damages and penalties. MAP § 32.039(b)(1-a) directly references the PSA and stipulates that,

  (b)  A person commits a violation if the person:

      (1)  presents or causes to be presented to the commission a claim that contains a statement or representation the person knows or should know to be false;

      (1-a)  engages in conduct that violates Section 102.001, Occupations Code [PSA];

      (1-b)    solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services[.]

40.    The defendant is liable for double the penalties sustained by the State as well as a civil penalty of not less than $5,000.00 and not more than $10,000.00 per claim submitted or paid. The monetary remedies under the TMFPA allows for recovery of up to twice the amount of the unlawfully procured payment sustained by the State, plus the State of Texas is entitled to a civil penalty in the range set forth by the TMFPA. If the unlawful act resulted in an injury to someone who is elderly, disabled or under 18, penalties are assessed in the range of $5,500 to $15,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants. For all other individuals, penalties are up to $10,000 per false or fraudulent claim.

41.    By knowing and intentionally violating the attestation requirements for claims submitted to Medicare and Medicaid by the individual Defendants, which led to the knowing and intentional inaccurate billing/coding and the subsequent submission of false claims for payment from Medicare, Medicaid and private payors; the knowing and intentional retention of the payments from the government, rendering medical services that were either worthless, nonexistent, lacked medical necessity and/or caused patient harm; and soliciting or providing remuneration in exchange for any good, service or facility. These unlawful acts, for example, providing kickbacks to medical providers such as Defendants Greg Gray, N.P., James Slayton, M.D., and Brent Mainwaring, M.D. by select Defendants (i.e., Tahir Javed, Riceland, Starco, WCH), caused false claims to be submitted to federal and state-funded health care programs.

***The Anti-Kickback Statute***

42.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (the "AKS"), expressly prohibits any individual or entity from offering, paying, soliciting, or receiving any "remuneration," which

includes "any kickback, bribe, or rebate," to "any person to induce such person" to purchase or recommend a product or service that is covered by Medicare or Medicaid.

43.    The AKS and analogous state laws make it illegal for individuals or entities to knowingly and willfully "offer[] or pay[] remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to purchase . . . , order . . . , or recommend purchasing . . . or ordering any good . . . or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).[12] Payments by a person to medical providers to induce them to utilize facilities, products and/or services that are ultimately paid for by federal and state health care programs are examples of such illegal remuneration.

44.    First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

45.    As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."

46.    According to the legislative history of the PPACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims

---

[12] Texas has enacted similar prohibitions against illegal inducements to health care decision-makers. *See, e.g.,* Tex. Occ. Code Ann. § 102.001.

for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854.

47.     Compliance with the AKS, 42 U.S.C. § 1320a-7b(b), is a condition of payment under the federal health care programs. Claims for products and services arising from kickbacks expressly and impliedly misrepresent compliance with a material condition of payment, to wit, compliance with the AKS.

48.     The AKS has been interpreted by the United States Court of Appeals for the Fifth Circuit to cover any arrangement where "one purpose" of the remuneration is to obtain money for the referral of services or to induce further referrals. *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998).

49.     HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the AKS because such practices would unlikely result in fraud or abuse. *See* 42 C.F.R. § 1001.952. Only those arrangements, however, that precisely meet all of the conditions set forth in the safe harbor regulations are afforded protection. None of the practices at issue in this case meet these safe harbor regulations.

50.     By providing kickbacks to medical providers such as Defendant Greg Gray, N.P., James Slayton, M.D., and Brent Mainwaring, M.D., select Defendants (i.e., Tahir Javed, Riceland, Starco, WCH) have caused false claims to be submitted to federal and state-funded health care programs.

### *The Stark Law*

51.     The Medicare/Medicaid Self-Referral Statute, 42 U.S.C. § 1395, *et seq*. (the "Stark Law") prohibits pharmaceutical manufacturers from paying remuneration to physicians for referring Medicare and Medicaid patients to the manufacturers for certain "designated health

services" including drug prescriptions where the referring physician has a nonexempt "financial relationship" with that manufacturer. 42 U.S.C. § 1395nn(a)(1), (h)(6)(J).

52.    The Stark Law provides that the manufacturer shall not cause to be presented a Medicare or Medicaid (or other government) claim for such prescriptions. The Stark Law prohibits payment of claims for prescriptions rendered in violation of its provisions. 42 U.S.C. § 1395nn(a)(1), (g)(1).

53.    Knowingly paying physicians to induce them to prescribe products or services for individuals seeking reimbursement for the respective good or service from a federal health care program or causing others to do so while certifying compliance with the Stark Law (or while causing another to so certify), or billing the government as if in compliance with these laws violates the FCA and the related state laws.

54.    Defendants' conduct alleged herein repeatedly violated the Stark Law, which in turn resulted in FCA violations because Defendants' unlawful payments to medical professionals induced (and still induces) those medical professionals to falsify medical necessity, refer nursing home patients to Riceland's Institutional Outpatient Program ("IOP") (e.g., behavioral health program), waive Medicare and Medicaid co-pays and enter into contracts that are above fair market value (i.e., Tahir Javed, Riceland and ODC, which is owned by Brent Mainwaring, MD), which are reimbursed by federal- or state-funded health care programs.

## V.  THE GOVERNMENT HEALTHCARE PROGRAMS

### *Medicare*

55.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for people age 65 or older; people under age 65 with certain disabilities; and

people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

56.    Medicare now has four parts: Part A; Part B; Part C; and the Part D Program.

57.    Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

58.    Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A.  Part B also helps pay for covered health services and supplies when they are medically necessary.

59.    Medicare Part C (Supplemental Insurance) enables Medicare beneficiaries to purchase Medicare approved plans through private insurance companies. Known as Medicare Advantage plans, an eligible individual must first enroll in Part A and Part B.

60.    Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs.

61.    The Medicare Program is administered through CMS, an agency of the U.S. Department of Health and Human Services ("HHS").  Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

62.    Medicare reimburses only reasonable and necessary medical products and services furnished to Medicare beneficiaries and excludes from payment services that are not reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.115(k). Providers must also assure that they provide medical services to Medicare recipients "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1).

63.     Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with rules developed by CMS.

64.     Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

65.     Under Medicare Part C, Medicare pays a fixed amount to companies offering the Medicare Advantage Plans for beneficiaries' care.  The companies that offer these Part C plans are required to abide by the Medicare Rules.  The out-of-pocket costs can vary between each Medicare Advantage Plan, which may include services and/or supplies.

66.     Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the federal government. Part D Sponsors are charged with and responsible for accepting Medicare Part D claims, determining coverage, and making payments from the Medicare Trust Fund.

67.     The principal function of both intermediaries and carriers is to make payments for Medicare services, and to audit claims for those services, to assure that federal funds are spent properly. CMS contracts out to Medicare Administrative Contractors ("MACs"), also known as carriers, to review, approve, and pay Medicare claims received from healthcare providers like Defendants (e.g., Riceland, WCH). Given that it is not either realistic or feasible for MACs to review medical documentation before paying each claim, payment is generally made under

Medicare based on the providers' certification on the Medicare claim form that services in questions were "medically indicated and necessary for the health of the patient."

68.    To participate in Medicare, providers must assure that their services are provided economically are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

### *Medicaid*

69.    Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act.  The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

70.    Medicaid is a cooperative federal-state public assistance program that is administered by the states. Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is significant.

71.    Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

72.    However, to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards.  A state must provide Medicaid coverage to needy individuals and families in five broad groups: (1) pregnant women; (2) children and teenagers; (3) seniors; (4) people with disabilities; and (5) people who are blind.  In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

### *TRICARE*

73.     TRICARE is a health care program for individuals and dependents affiliated with the armed forces. It is administered by the United States Department of Defense ("DOD"). TRICARE also contracts with fiscal intermediaries and managed care contractors to review and pay claims.

### *CHAMPVA*

74.     CHAMPVA is a healthcare program for veterans and dependents. It is administered by the United States Department of Veteran's Affairs ("VA"). CHAMPVA also is a comprehensive health care benefits program in which the VA shares the cost of covered health care services and supplies with eligible beneficiaries.

### *Federal Employee Health Benefits Program*

75.     The Federal Employee Health Benefits Program is administered by the Office of Personnel Management. It is a system whereby employee health benefits are provided to civilian government employees and annuitants of the United States government.

### VI.  THE FRAUDULENT SCHEMES

76.     To reiterate, there are three areas of fraud identified herein and unlawful conduct that the Defendants knowingly and intentionally engaged in, thereby violating the False Claims Act and Texas Law. The three main categories are: fraudulent billing and claims submission scheme; worthless and/or non-existent services that lacked medical necessity scheme; and kickback scheme, which included the routine waiver of copays, where one purpose was to induce referrals and/or the utilization of medical services at Defendants' facilities.

### *The Fraudulent Billing and Claims Submission Scheme*

77.     Physicians, hospitals, pharmacies and other health care providers and facilities ("Providers") enter into Provider Agreements with the Center for Medicare and Medicaid Services

("CMS") in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which Providers may not seek reimbursement from federal healthcare programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

78.     Upon approval the healthcare provider or hospital receives a Medicare provider number that is cross-referenced with their tax ID number. Each provider also has a National Provider Identifier ("NPI").

79.     When submitting a bill under any of the federal health care programs, the healthcare provider must use codes (e.g., ICD-10, CPT) to identify the services, diagnoses and/or procedures rendered, who rendered the procedures, where the services were rendered, who is to be reimbursed and how much the government is charged.

80.     Physicians enter these codes on Form CMS-1500. Hospitals use Form CMS-1450, also referred to as UB-04. These forms are used universally and are submitted to most third-party payors of healthcare services, including Medicare, Medicaid, TRICARE, CHAMPVA and The Federal Employee Health Benefits Program. The forms are typically submitted electronically. The codes entered on the forms determine who receives payment and how much Medicare, Medicaid, TRICARE, CHAMPVA and/or The Federal Employee Health Benefits Program, as well as other Government Programs will pay for the service (s) or the good(s) provided.

81.     In order to receive payment from federal funds for a claim, Form CMS-1500 further requires a provider to "certify that: 1) the information on this form is true, accurate and complete;

2) I have familiarized myself with all applicable laws, regulations and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills."

82.    CMS Form UB-04 has similar requirements related to its certification: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISPRESENTATION OR FALISFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." The claim certification requirements include meeting

medical necessity, having the requisite physician certifications, and attesting that there was no actual knowledge, reckless misrepresentation or concealment of fraudulent claims.

**_Critical Access Hospitals and Rural Health Clinics_**

83.    According to the American Hospital Association, critical access hospitals ("CAHs") "represent a quarter of all U.S. and more than two-thirds of all rural community hospitals. Securing the future of CAHs and the essential role they play in caring for rural America is of paramount importance."[13] Similarly, rural health clinics ("RHCs") were established to address the issue of the inadequate number of physicians available to provide care to Medicare patients in rural areas, as well as to increase the use of other advanced medical professionals (i.e., nurse practitioners and physician assistants) in rural areas.

84.    In many states, such as Texas, a "hospital district may be created and established and, if created, must be maintained, operated, and financed in the manner provided by Article IX, Section 9, of the Texas Constitution and by this chapter. Texas Health and Safety Code, Chap. 286, Sec. 286.002. The relationships and reimbursement scenarios between a CAH, RHC and hospital district can be complex.

85.    The Winnie Stonewell Hospital District is a political subdivision of the State of Texas organized pursuant to Tex. Const. Art. IX, § 9 (2014) and Chapter 286 of the Texas Health and Safety Code. "The District has invested in Riceland Hospital's (formerly known as Winnie Community

---

[13] American Hospital Association, _Critical Access Hospitals_,

https://www.aha.org/advocacy/critical-access-hospitals (last visited May 25, 2019).

Hospital) services and infrastructure so that the District's residents and needy will have access to a better healthcare facility."[14]

86.    Winnie Community Hospital, LLC had Riceland Medical Center designated as a Critical Access Hospital. A CAH is a specific category of hospital, which is certified under a set of Medicare Conditions of Participation ("CoP").

87.    Since 1997, several significant pieces of key legislation have resulted in the creation and modification of the CAH program. Most notably are the Balanced Budget Act of 1997 ("BBA"), Pub. L. 106-113 (2007), The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 106-113 and the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. 111-148 (2010).

88.    Otherwise known as the Affordable Care Act, PPACA includes provisions unique to CAHs. Section 3128 of the ACA allows a critical access hospital to continue to be eligible to receive 101% of reasonable costs for providing: (1) outpatient care regardless of the eligible billing method such hospital uses; and (2) qualifying ambulance services.

89.    Structured differently than an acute care hospital CoP, CAH certification requires that certain parameters are met. For example, not having more than 25 inpatient beds; maintaining an annual average length of stay of no more than 96 hours for acute inpatient care; having 24-hour, 7-day-a-week emergency care; and being located in a rural area, at least 35 miles drive away from any other hospital or CAH (fewer in some circumstances). CAHs are also reimbursed differently than acute care hospitals by Medicare. Specifically, instead of standard fixed reimbursement rates

---

[14] Winnie Stonewall Hospital District, http://wshd-tx.org/about/ (last visited Dec. 5, 2018).

(i.e., a predetermined, fixed amount), CAHs receive cost-based reimbursement (i.e., a specific cost methodology, which for inpatient stays is 101% x Cost).

90.     Like CAHs, reimbursement for RHCs varies from a typical acute care hospital or physician's office. "RHCs are paid an all-inclusive rate (AIR) for medically-necessary primary health services and qualified preventive health services furnished by an RHC practitioner." Presently, there are approximately 4,100 RHCs nationwide, which furnish both primary care and preventative health services to patients in rural and underserved areas.[15] "The Rural Health Services Act of 1977 (Public Law 95-210) was enacted to address an inadequate supply of physicians serving Medicare patients in rural areas and to increase the use of non-physician practitioners, such as nurse practitioners (NPs) and physician assistants (PAs) in rural areas." In order to qualify as a RHC, the following conditions must be met:

  a.  A clinic must be located in a non-urbanized area (definition set forth by the U.S. Census Bureau);

  b.  An area currently designated within the previous 4 years by the Health Resources and Services Administration as one of these types of Federally designated or certified shortage areas: Public Health Service Act ("PHSA") Section 332(a)(1)(A) (primary care geographic health professional shortage area); PHSA Section 332(a)(1)(B) (primary care population group); PHSA Section 330(b)(3) (medically underserved area); or Omnibus Budget Reconciliation Act of 1989 Section 6213(c) (governor-designated and Secretary-certified shortage);

  c.  RHCs must employ an NP or PA;

---

[15] Center for Medicare and Medicaid, Rural Health Clinics, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/ruralhlthclinfctsht.pdf (last visited Nov. 5, 2018).

d.  Have an NP, PA, or CNM working at the RHC at least 50 percent of the time that the RHC operates;

e.  Directly furnish routine diagnostic and laboratory services;

f.  Have arrangements with one or more hospitals to furnish medically necessary services that are not available at the RHC;

g.  Have the appropriate drugs and biologics necessary for emergencies; and

h.  Furnish all of these laboratory lab tests on site: chemical examination of urine by stick or table method or both; hemoglobin or hematocrit; blood sugar; examination of stool specimens for occult blood; pregnancy tests; and primary culturing for transmittal to a certified laboratory;

i.  Perform quality assessment and performance improvement programs;

j.  Post days and hours of operation to the public;

k.  Not be a rehabilitation agency or a facility that is primarily for the treatment of mental disease;

l.  Not be a Federally Qualified Health Center; and

m.  Meet other applicable State and Federal requirements.[16]

91.    Here, Defendants WCH, Riceland Clinics, nursing homes, medical practitioners and various imaging providers executed a complex billing scheme utilizing higher reimbursement rates available through CAH and RHCs, despite not meeting the statutory requirements, altering the codes on claims after a denial and switching the form from CMS Form 1500 to Form UB-04.

92.    In the end, the government-funded healthcare system operates on the honor system. Given that it serves almost 100 million people, it is simply impossible for the Government to monitor and confirm the legitimacy and accuracy of every claim. The entire system is designed to ensure taxpayers pay only for medically necessary services rendered by qualified providers in

---

[16] *See* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/ruralhlthclinfctsht.pdf (last visited Nov. 5, 2018).

accordance with the rules and regulations, free from transactions that were induced by illicit referrals. Unfortunately, the healthcare system is subject to abuse by unscrupulous providers.

93.     Defendants, individually and acting by and through certain of their officers and employees, in concert with each other, did knowingly conspire, confederate, and agree to violate various laws and regulations governing claims submission to CMS, DOD, the VA, other federal agencies ("Federal Programs") and the State of Texas, and to retain the overpayments made by these Government Programs and private payors.

94.     Riceland Healthcare System describes itself as an "integrated network of physicians, hospital, hospice, home health and other service **[sic]** dedicated to providing the highest quality, affordable patient care across South East Texas…."[17] It owns and/or operates a group of health care institutions and facilities; employs a range of health care providers, including physicians, physician's assistants, nurse practitioners and nurses; and supports its physicians, employees and facilities with "an expert management team and industry-leading technology and tools and resources…."[18]

95.     Included in the Riceland Healthcare System institutions, facilities, providers and services are nurse practitioners who provide behavioral health services to patients in nursing homes and assisted living facilities in Southeast Texas (referred to as the Intensive Outpatient Program ("IOP")); Riceland Medical Center, formerly known as Winnie Community Hospital, an Outpatient Diagnostic Center located at 3405 College Street, Beaumont, Texas 77701; the

---

[17] Riceland Healthcare "About Us" webpage, www.ricelandhealthcare.com/about-us/ (last visited August 6, 2018).

[18] *Id.*

Riceland Imaging Center[19] located at 390 North 11th Street, Beaumont, Texas 77702; the Riceland Surgery Center (also known as Oprex Surgery Beaumont), also located at 390 North 11th Street in Beaumont; and Houston Premier Radiology Corp, located at 12853 Gulf Freeway, Houston, Texas 77034.

96.    The President and Chief Executive Officer of the Riceland organizations is Defendant Muhammad Tahir Javed.[20] His son Saad Javed is the Co-Chief Operating Officer. Defendant Mohammed Danishmund is the Chief Financial Officer, Asjad Moeeni is the Senior Accountant under Danishmund and Noushad Housein is the Financial Director's Assistant. All work from the main corporate office in Beaumont.[21] Defendant Julie Haire is the Accounting Manager and Defendant Cindy Wainwright[22] is the Director of Billing Operations. Both Haire and

[19] The Riceland Imaging Center was previously known as the Clarus Imaging Center.

[20] On his LinkedIn page this Defendant holds himself out as "the CEO & President of the hospital called Riceland Medical Center in Winnie, Texas, which has a critical access designation and has been serving the local community for over half a century. Muhammad Tahir Javed also owns a Hospice Care facility in Beaumont, Surgery Center, Imaging facilities, behavioral Health, Home Health, clinics and various other facilities all under the name of Riceland." https://www.linkedin.com/in/mtahirjaved (last visited Aug. 6, 2018).

[21] All titles in this section are taken from the "About Us" webpage, save for Noushaad Housein's. *Id.*

[22] Wainwright's full name appears to be Cindy Wainwright-Brown and on her emails, she lists her title as "Director of Revenue Cycle".

Wainwright are located in the Riceland Healthcare Fort Worth Office.[23] Much of the billing was done by Transcure LLC, a corporation partially owned by Muhammad Tahir Javed with its main office located in Lahore, Pakistan and a branch in New Jersey. According to its website, Defendant Transcure's New Jersey office at 850-B, Woodbridge Center Drive, Woodbridge, NJ.[24] Transcure holds itself out as providing "[m]edical billing services of high quality, exact precision and extreme accuracy."[25] Qaiser Raza was the Transcure supervisor in charge of the Riceland account and working under his direction as "Billers" for the Riceland account were three Pakistani nationals. All were located in Pakistan. Billing for the Riceland Imaging Center, Outpatient Diagnostic Center and Houston Premier Radiology was done by Drew Barsch, who lives and works in Round Rock, Texas.

97.    Amongst the physicians in the Riceland network are Dr. Edward Gripon (psychiatrist) and Dr. James Slayton (internal medicine). The four nurse practitioners who participated in the Behavioral Health Program at the relevant times were Gregory Gray, Angela Rainey, Daylon Long and Dale Brock. Waylon Bergeron was a nurse practitioner in the Behavioral Health Program prior to March 2018.

98.    On March 5, 2018, Relator Kristian Newby was hired by Winnie Community Hospital, LLC to serve as Riceland Healthcare System's Business Office Manager. She worked at

---

[23] The address of the Fort Worth office is 8851 Camp Bowie West, Suite 285; Fort Worth, Texas 76116.

[24] www.transcure.net (last visited Aug. 6, 2018).

[25] *Id.*

the Riceland Healthcare corporate headquarters in Beaumont, Texas. A portion of Ms. Newby's job duties included auditing certain programs and services.

### *The Behavioral Health Intensive Outpatient Program Referral and Kickback Scheme*

99.     While Relator was employed at Winnie Community Hospital, Inc., the Intensive Outpatient Program utilized nurse practitioners, Defendants Gregory Gray, Angela Rainey, Daylon Long and Dale Brock to engage in unlawful acts and knowingly submit false and fraudulent claims. The nurse practitioners traveled to nursing homes and assisted living facilities in Southeast Texas to provide mental health services to residents of those facilities. Among the nursing homes these nurse practitioners visited were Pine Arbor, Silsbee Oaks and Silsbee Convalescent in Silsbee, TX; Magnolia Manor in Groves, TX; Village Creek in Lumberton, TX; The Arboretum in Winnie, TX; Summer Place, Beaumont Healthcare Center, Calder Woods, The Oaks at Beaumont, Clairmont Beaumont and Pelican Bay Assisted Living Facility in Beaumont, TX; Liberty Health Care in Liberty; Cypress Glen[26] in Port Arthur, TX; and Dogwood Trail Manor and the Woodville Convalescent Center in Woodville, TX.

100.     During the course of her employment, Relator received a variety of complaints from patients and their families regarding inflated charges (i.e., bills for services never provided or for services that were not medically necessary), substandard care, and inadequate record keeping.

101.     On June 20, 2018, Relator Kristian Newby received a call from J.L., the son of two residents of Pelican Bay Assisted Living facility. J.L. complained his parents were being excessively billed.

102.     J.L. reported that each of his parents was being seen three times a month by a Riceland network provider, once by Dr. James Slayton, who occupies a bottom floor suite at the

---

[26] Cypress Glen has been closed since Hurricane Harvey.

Riceland Corporate Office and is still under contract with Riceland, once by a Riceland podiatrist Dr. Sarah Sweeney and once by Defendant Gregory Gray, one of the nurse practitioners in the IOP. Neither he nor his parents had requested treatment by Gray nor, to his knowledge, were Gray's services authorized. While on the phone with J.L., Relator Newby looked at the billing and could see Defendant Gray was billing for monthly exams.

103.    Ms. Newby could not, however, explain to J.L. why Gray was seeing J.L.'s parents. Promising J.L. to get to the bottom of the issue, after the call ended Newby texted Gregory Gray to try to get an answer regarding J.L.'s parents. She received no response. She then emailed Dr. Slayton, who promptly responded by email the same day (June 20th) that he only sees J.L.'s parents once a month. Dr. Slayton wrote that his records supported his monthly visit, but he "Can't speak for anyone else. We don't have anything to do with psych svs so I don't know what that's about." Relator forwarded this response to her supervisor, Defendant Cindy Wainwright, to try to determine why Defendant Gregory Gray was seeing the parents, but never received a reply from Wainwright.

104.    Either the next day or two days later, on June 22nd, Gregory Gray came to Relator's office and asked "what was going on" with the two patients. Ms. Newby recounted the phone conversation and asked Defendant Gray whether he had authorization to see  J.L.'s parents once a month. After some discussion Defendant Gray responded he would just "take them off his list of people" to see. Ms. Newby replied to Gray that this did not answer the question about whether he had an authorization to see the parents, but Gray never answered. Instead, he repeated that he would remove the parents from his list of patients he was treating and left. Relator Newby wondered why Defendant Gray was cutting his ties with patients with no explanation, especially if he was providing needed medical care and treatment. Either that day or early the following week,

Page 39

Kristian Newby had an in-person conversation with Defendant Julie Haire in Beaumont. During that conversation, Ms. Knewby relayed her concerns about Defendant Gray to Defendant Haire. Ms. Knewby told Defendant Haire that there was an issue with Gray and his nursing home rounds. Specifically, questioning whether he was even seeing those patients he was billing, as Gray was billing a lot of hours for a man who was simultaneously seen hanging around corporate offices in Beaumont a significant portion of the time. Defendant Julie Haire looked at Relator and stated, "I've always suspected the same thing" and promised to meet with Chief Financial Officer Mohammed Danishmund to "take care of it."

105.    Ms. Knewby returned to her work, after being assured by Defendant Haire that the issues that she raised in relation to medical necessity, false billing claims and sub-standard patient care would be resolved. Over the course of the next few days Relator was copied on an email sent by her supervisor Cindy Wainwright to Gregory Gray. Wainwright wrote to Gray "Medicare has requested a RAC audit" on a Medicare patient allegedly seen at Gulf Health Care Center in Port Arthur by Waylon Bergeron, a nurse practitioner who used to work in the Intensive Outpatient Program. Seven dates of service in 2016 and 2017 were at issue. The nursing home could not find any of Bergeron's progress notes, and Wainwright wrote "these records may have been destroyed in Hurricane Harvey." She instructed Defendant Gray "We need a letter from Gulf Healthcare NH stating records were destroyed, if no copies were kept by Waylon Bergeron. This is a major event for Medicare to request medical records and there is no proof of services rendered. This could red-

flag the RHC[27] and needs to be resolved ASAP." On June 27, 2018, Cindy Wainwright sent an email to Relator, among others, indicating that when Waylon Bergeron left the company, Gregory Gray "kept his NH [nursing home] progress notes on a Hard Drive." Gray was going to attempt to locate the notes. Wainwright went on to write "Greg assures me that NH progress notes are kept on file."

106.    In order to appreciate the importance of the next comments, the claims process for the nurse practitioners in the IOP must be explained. The nurse practitioners filled out either hand written or Excel spreadsheet charge sheet upon which they listed the name of each patient seen, where they saw the patient, the date of the visit, and codes (e.g., CPT, HCPCS, ICD-10). The codes were used to indicate the amount of time spent with each patient, the patient's treatment(s) and diagnosis. A sample redacted charge sheet is attached as Exhibit 3. These charge sheets were then delivered, either electronically or in person, to the corporate business office in Beaumont, which was led by Relator and the main billing office in Fort Worth, Texas. The main billing office in Fort Worth, which was the main revenue cycle management office, where Cindy Wainwright and Julie Haire, who were Relator's supervisors, were located. Wainwright and Haire reported directly to Defendant Danishmund.

107.    Members of Relator's team, most frequently Meagan Steele, would then verify insurance through Novitas and Availity, obtain face sheets (i.e., resident patient's admission sheet, medications, intake form, past and current medical conditions, allergies) from the nursing home

---

[27] RHC stands for Rural Health Clinic. Winnie Community Hospital, Inc. was billing for all services rendered at the nursing homes by these nurse practitioners through the Riceland Medical Center, a hospital located in Winnie, Texas.

and confirm the patient's status. The patient's status was checked in Centrix for the patient's history within the Riceland Facilities, as well as whether or not the patient was new to the facility, a subsequent encounter or sequela.

108.    Once confirmed, Steele would then send the charge sheets electronically to Transcure's office in Pakistan.[28] A Transcure employee would then convert the charge sheets into claim forms, upload the claim forms to the Clearing House and submit the claim forms. The Clearing House, an external organization, would then send the forms to the Government and payors requesting payment for the services rendered.

109.    At no time were the nurse practitioners required to provide documentation of their visits or substantiate the medical necessity for the treatment they rendered. No progress notes were required to be submitted with the charge sheet, much less a treatment plan. In most instances, progress notes were absent from the chart.

110.    In the June 27, 2018 emails, Wainwright also noted that "we need to come up with a plan that all provider progress notes are submitted with the daily charge sheets." She made this comment because neither Defendant Riceland Healthcare Services nor Defendant Winnie Community Hospital, Inc. had documentation of the professional services allegedly rendered by the nurse practitioners in their records. In the June 27th email Wainwright wrote that "Greg [Defendant Gregory Gray] will be meeting with E-Clinicals to start the process of having all Psych NH providers on the E-clinical software."

---

[28] Prior to June 2018, AB&C was used for clinics and nursing homes and Transcure was used for ambulatory surgery centers ("ASC"). In June 2018, Transcure was then utilized for all facilities, not just ASC.

111.    On June 29, 2018, slightly after 8:30 A.M., Relator sent nurse practitioner Dale Brock a text, asking whether he saw patients in June, as the end-of-the-month deadline for billing for work was fast approaching. Brock promised to send his list of patients seen and supporting documentation. He later faxed this information to Relator's office at approximately 12:45 P.M. One of Newby's team members, Meagan Steele, pulled the sheets off the fax machine and logged into CENTRIQ, the main records system, to review the information submitted regarding each patient Brock had allegedly seen. Later that afternoon Meagan Steele came to Ms. Newby to report Defendant Brock was billing for an alleged June 13th visit with a patient, E.S., at Magnolia Manor in Groves. The patient had died in November 2017.

112.    Relator immediately reported this information to Mohammed Danishmund. Subsequently, a series of meetings occurred involving Relator, Danishmund, Gregory Gray, Meagan Steele, and Asjad Moeeni, to determine whether this was either an inadvertent error or a pattern of improper billing by the IOP nurse practitioners. Eventually Relator was told there was no error, that there was a new patient at Magnolia Manor who just coincidentally had the same name as the one who died in November 2017.

113.    Shortly thereafter, multiple potential billing issues by the IOP nurse practitioners were brought to the attention of both Ms. Newby and select members of the management team. These potential billing issues included the number of behavioral health visits rounds by the IOP nurse practitioners increasing (i.e., the trend began in December 2017 and by March 2018, the behavioral health visits nearly tripled) and complaints by patients and families, were apparently escalated to the Riceland Healthcare Services executive team. On Tuesday, July 3rd, the Riceland Co-Chief Operating Officer/Hospital Administrator Saad Javed called Ms. Newby on the phone in her office. Saad Javed then announced to Ms. Newby that Danny Thompson, a physician's

assistant, and Jeanne Martinez, Director of Nursing at the Riceland Medical Center were on the call.

114.    Danny Thompson  discovered that Defendant Gregory Gray charged a patient for a nursing home round visit, when in actuality, the patient was in the hospital at the time of the alleged service.  Saad Javed asked Relator about her audits of the nursing home and assisted living facility visits, as well as the protocol she followed for the billing and claim errors. Ms. Newby advised the conference participants that she reported discrepancies to her supervisors, Defendants Haire, Wainwright and Danishmund, but she did not believe that they took her seriously. Saad Javed then expressly asked the Relator to provide him a report regarding these occurrences with examples, so he could review the frequency and issues.

115.    Because of the issues with the billing discrepancies that occurred in late June, Relator had previously requested from Karen Horn, a Riceland Healthcare Services employee located in Louisiana, an Excel spreadsheet showing all June 2017-June 2018 nursing home and assisted living facility rounds made by any employee of Riceland Healthcare Services and/or Winnie Community Hospital, Inc. who billed for their services. Karen Horn emailed the Excel spreadsheet to Relator within an hour. After reviewing the spreadsheet, Relator was aware the five nurse practitioners associated with the Intensive Outpatient Program (Bergeron, Gray, Rainey, Long and Brock) had reported over 21,000 nursing home and assisted living facility patient visits.

116.     Riceland billed for these visits, and the overwhelming majority of the claims were sent to the United States government for payment by a federal healthcare program. Because Ms. Knewby could not possibly review all of the visits, she conducted a detailed random audit of thirty patients.

117.    On July 8, 2018, Newby emailed Saad Javed a detailed report with screen shots of bills to nursing home patients who reported being wrongfully billed and as well as screen shots of patients who were in the hospital at the time they were billed for nurse practitioner visits on nursing home rounds. The next day, July 9,2018  Kristian Newby provided Saad Javed with the findings of the thirty-patient audit. Fourteen of the thirty patients had billing errors, the majority of which were attributed to Greg Gray. The errors include, but are not limited to the following: billing for seeing patients who had died prior to the alleged visit, billing patients for visits in the nursing home when the patients were in the hospital at the time of the alleged visit, double billing in relation to nursing home discharges and providing care to patients whose families had complained to Ms. Newby that the nurse practitioners did not have their consent for treatment. The majority of the patients had billing errors, which were attributable to Defendant Greg Gray. After Ms. Knewby's presentation, while she was still in his office, Saad Javed called his father, Defendant Muhammed Tahir Javed, and told his father "[t]his is the biggest thing uncovered this year." Tahir Javed set a meeting with Relator in his office for that afternoon. At 3:30 PM Relator was asked by Saad Javed to come to his office.

118.    On July 10, 2018, Saad Javed came to Kristian Newby's office to update her on the status of the 14 patient claim audits, which she presented him the day before. Saad Javed stated that only five or so of the cases appeared to involve improper billing and that the company was going to refund the money.[29]

---

[29]  When Relator last checked, in July 2018 prior to her termination, the patients and/or payors had not been reimbursed.

119.    Kristian then said a full audit should be performed on all the nursing home and assisted living facility rounds being made by the IOP nurse practitioners to determine the accuracy of past Medicare billing and collections. Her audit of thirty patients had produced what she felt was a 50% error rate, and, even if there were only five cases of improper billing, that was a error rate of over 16%. Since the IOP nurse practitioners had submitted over 21,000 bills to the Government, as well as some private insurance companies and private pay patients, it was her belief that there could be thousands of wrongful charges for which Riceland would need to reimburse the United States, the State of Texas and other payors. Further, given the emails from Defendant Cindy Wainwright in late June regarding the lack of medical record documentation to substantiate the services for which the nurse practitioners had billed were even provided, it was possible that an even greater number of the over 21,000 bills contained false representations. Saad Javed told her upper management "was looking into it".

120.    The morning of July 11th, Ms. Knewby received a phone call from J.W., a woman whose husband was a patient at Village Creek Rehabilitation and Nursing Center in Lumberton, Texas. J.W. received a bill from Riceland for services that did not have the patient's authorization. Specifically, patients' initial assessments and follow-up visits by Gregory Gray. The nurse at Village Creek told J.W. that Riceland came to the facility looking for "recruits." J.W. told Village Creek that Riceland personnel did not have her permission to see her husband. Yet, she continued to receive bills for Defendant Greg Gray's services. J.W. had a nurse write on her husband's chart that the Riceland employee was to call her when Gregory Gray was at the facility. J.W. told Greg Gray that he did not have consent to see her husband. Although Greg Gray never had consent to provide treatment, the bills from Riceland kept coming. That led J.W. to contact the Riceland corporate office. Ms. Newby happened to be at the office and helped resolve the issue. Kristian

asked J.W. to put her experience in an email and send it to her. J.W. did so, and Kristian forwarded the email to Mohammed Danishmund, Greg Gray, Cindy Wainwright and Julie Haire as additional documentation of the problems with the IOP nurse practitioners.

121.    Later that day Kristian Newby was summoned into the conference room by Mo Danishmund and Julie Haire for a meeting regarding the nursing home and assisted living facility billing and claim issues, as well as the fraud she had uncovered.

122.    While she had not been given advanced notice, the other meeting participants obviously knew about the meeting. Present at the meeting were three of the nurse practitioners (i.e., Defendants Gregory Gray, Angela Rainey and Daylon Long) and the Chief Financial Officer Defendant Mohammed Danishmund. In this meeting several important matters were discussed. The first involved the lack of medical record documentation to support the services for which Riceland Healthcare Services and/or Winnie Community Hospital, LLC were billing. Ms. Newby was first told the corporate policy was for the providers to keep records to substantiate all visits and to upload these records to a Dropbox account. The three providers present in the meeting then all admitted they did not upload their progress notes or medical records as required. Defendant Daylon Long told Relator his Dropbox email did not work so he had never uploaded anything. Besides, he added, it was not his responsibility to keep his documentation regarding the treatment he was providing, but rather the obligation of the nursing homes. Defendant Angela Rainey stated that she had never been advised of the policy and did not have a Dropbox account. When Relator asked Rainey if she had any documentation at all to substantiate the medical necessity of her patient visits, Rainey did not comment.

123.    The conversation then turned to whether the nurse practitioners were required to have the consent of their patients or the patients' families to provide treatment. All three admitted

they never had written consent to see the patients, but rather they were providing psychiatric or behavioral health services to patients based on the general consent forms the patients or the patients' families had given the nursing homes and assisted living facilities.

124.    Finally, the participants discussed whether physician's orders were required for the nurse practitioners to render services. Defendant Gregory Gray took the position that physician's orders were not necessary for the nurse practitioners to see nursing home patients, but rather such visits were allowed under the global consent forms signed at each nursing home facility. Further, he said this was the basis for almost all the visits the nurse practitioners had made under the IOP.

125.    Defendant Gray literally meant if the nurse practitioners could persuade the nursing homes to allow them to see a resident, they could visit the patient and then bill the United States of America or the State of Texas without ever having been requested by a physician to see the patient.

126.    The next morning, July 12, 2018, Relator saw Chief Financial Officer Mohammed Danishmund in front of the Riceland Healthcare System Corporate Office. Ms. Knewby was exiting the building to go to a WCH conference at 10am regarding an eClinicalworks presentation to integrate the nursing homes into the eClinicalworks system. The individuals present at the meeting included Linda Bennett, Greg Gray, Dylan Long, April Monroe and Saad Javed. Defendant Danishmund asked her directly whether she thought Gregory Gray was committing billing fraud. She replied, "Yes sir!" Danishmund responded "you know as well as I do, he [Greg] is always here at the office." Danishmund's comment was a direct reference to the concerns raised by the fact that Defendant Gray, who billed many hours for services allegedly provided, was observed by employees, including Kristian Newby, to be hanging around the corporate office in

Beaumont a lot. It seemed very unlikely he was able to bill the hours he was billing and be physically present in Beaumont so much of the time.

127.    At lunch on the 12th Relator decided to visit Pelican Bay Assisted Living and Memory Care Community facilities, which are located in Beaumont, Texas. Newby drove to the facility and met with the Pelican Bay Director of Nursing, Maria Hancock. Newby first asked Hancock if there were consent forms on file allowing the nurse practitioners involved in the Intensive Outpatient Program to see the Pelican Bay patients.

128.    Mrs. Hancock told Ms. Newby their facility did not have consent forms allowing the nurse practitioners to see any of the Pelican Bay patients. Global consent forms, although impermissible, were also not utilized. In response to a question posed by Ms. Newby, Maria Hancock also relayed that there were no physician orders authorizing Greg Gray to see Pelican Bay patients. To substantiate her ascertion, Mrs. Hancock began to pull the patients' charts so Kristian Newby could see for herself that there were no physician orders for Gregory Gray to see the patients. Relator contacted Dr. Slayton, who was the primary care physician for most of the patients. Dr. Slayton personally told Kristian Newby that he had only asked Gregory Gray to see maybe one or two of the residential patients at Pelican Bay and that he had certainly not issued orders for Gray to see all the patients he had been seeing, services for which Riceland Health Services and/or Winnie Community Hospital, Inc. had billed the Government, among others.

129.    Finally, Maria Hancock told Kristian Newby that Pelican Bay had surveillance video that would show Defendant Gray's visits and the amount of time he spent at the facility. The total time certainly did not amount to the four to five hours he was billing for patient visits. As Ms. Newby prepared to leave to return to her office, Maria Hancock gave her a blank copy of the

Pelican Bay admissions packet and a copy of the consent form Mrs. Hancock had only been recently given by Defendant Gregory Gray.

130.    As she drove back to the Riceland Healthcare Services' office, Relator felt her suspicions, bolstered by the confessions of the nurse practitioners the day before, had been confirmed: a significant number of visits made by the nurse practitioners in the Intensive Outpatient Program were done without the patient's request, without physician's orders and without documentation to substantiate the medical necessity of the visits. Further, Defendant Gray, at least, had falsely billed for time that he had not spent at the facility and submitted claims for that he had not provided. The United States of America, the State of Texas and private payors were billed and paid for medical services that were not provided. Those payments were knowingly retained by the Defendants and had not been returned to either the government or private payors.

131.    When Kristian Newby returned to corporate headquarters she saw Julie Haire. Ms. Newby reported to Defendant Haire about her visit to Pelican Bay and what she had learned, including the existence of surveillance films that appeared to document that Gregory Gray was fraudulently billing, expressed her concerns and gave Defendant Haire the materials she had been given by Maria Hancock. Approximately two hours after their visit, Defendant Haire called Kristian into Defendant Danishmund's office, where they jointly issued Ms. Newby a written reprimand for failing to follow the chain of command regarding problems discovered through audits and for being inappropriate and confrontational with others. Further, in the meeting Defendant Haire, in front of Defendant Danishmund, ordered Kristian Newby to stop going to nursing homes or assisted living facilities, to cease investigating the identified fraud, and to stop meeting or having contact with the nursing home employees. In short, instead of thanking Ms.

Newby for having uncovered a scheme designed to defraud the United States and the State of Texas, Relator's supervisors reprimanded her and ordered her to stop her investigation.

132.    On Friday, July 13th there was allegedly a conference call in which certain Riceland Healthcare/Winnie Community Hospital employees allegedly spoke with the corporation's external "medical attorney". Relator was expressly told that she could not participate in the call, although Julie Haire did ask Ms. Newby what questions she would like addressed. Kristian Newby listed a series of questions for Defendant Haire to ask, including but not limited to: are physician orders required before a nurse practitioner can see a patient; does the nurse practitioner have to prepare progress notes reflecting each visit; since these are mental health patient rounds, did the patient have to have capacity to consent and how was that determination to be made; did the nurse practitioners have to have informed consent from the patients before prescribing medications; was a plan of care required between the provider and the nurse practitioner; and is there a requirement to renew the physician's order and, if so, how often?

133.    Defendant Haire wrote down all the questions and entered the office of the compliance officer, Indigo Soriano to participate in the call. Through the glass office walls, Relator could see that Haire, Soriano, Gregory Gray and Mohammed Danishmund were present for the alleged conversation. After the conference call Defendant Julie Haire told Kristian Newby the patients were covered by global consent forms signed by the patients when they entered the nursing homes and assisted living facilities and if there was a physician's order, no consent form was necessary. Further, she said Gregory Gray claimed to have progress notes documenting all his visits and he was going to go to the nursing homes and assisted living facilities and insert them in the charts. Ms. Newby told Defendant Haire there was no way this was true. For example, she had looked at all the charts at the Pelican Bay facility and had spoken to family members of residents

of two other nursing homes who had specifically written that consent was not given to see their family members without their permission, and no permission had been given. Those charts reflected no physician's orders, no consent and no documentation of the visits. Newby asked if payors were going to be reimbursed for all prior care rendered without either a consent form or physician's authorization. Defendant Haire sighed, told her "it was being addressed," and walked off. At no time prior to Relator's discharge did she ever see any indication the United States of America, the State of Texas, private payors or insurance companies were going to be reimbursed by any of the Riceland entities. Indeed, prior to her discharge, Relator looked at the billing information and noted that no one had been reimbursed for charges that Riceland Healthcare Services and/or Winnie Community Hospital LLC knew were inappropriate.

### *Outpatient Diagnostic Center Billing Scheme*

134.    In addition to the nurse practitioners in the Intensive Outpatient Program, the Riceland ODC had billing and coding issues. On or about October 3, 2017 Winnie Community Hospital, LLC took over the operation of the Outpatient Diagnostic Center (ODC). Located at 3405 College Street in Beaumont, the ODC was physically several miles from Winnie Community Hospital in Winnie, Texas.[30] The ODC offered facilities for a variety of tests were performed, including MRIs, CT Scans, ultrasounds and X-rays. For women, the ODC provided mammograms, bone density testing and breast MRIs, among other tests.[31] The ODC webpage advertises "these are the very same imaging services you will find in a hospital, but in a more comfortable, outpatient

---

[30] https://www.mapquest.com/routeplanner/narrative (last viewed August 8, 2018).

[31]    A detailed listing of services offered can be found on the ODC's webpage, http://www.theodc.net/services.php (last viewed August 8, 2018).

environment."[32] The vast majority of the claims for testing performed from October 2017 until July 24, 2018 were billed to the United States of America.

135.    From the start Defendant Cindy Wainwright knowingly and intentionally billed the United States and other payors for the tests performed at the ODC at hospital rates, even though the tests were performed at an outpatient facility several miles away. Relator learned of this billing scheme shortly after she started work with Winnie Community Hospital in March 2018, at a meeting with Defendant Cindy Wainwright and Vanessa Ellis, the office manager at the ODC, that was held at the ODC office at 3405 College Street. Defendant Wainwright drove Relator to the first meeting with Vanessa. At that time Vanessa told Cindy she was receiving patient complaints regarding the excessive rates the ODC was charging them. The patients were complaining they were being charged at very high rates. Defendant Wainwright responded that they had always charged at hospital rates, and Ms. Ellis pointed out that the ODC was not a hospital. Defendant Wainwright said they could charge hospital rates because the ODC was a d/b/a and the bills were being sent to the payors by Winnie Community Hospital. Vanessa Ellis at that time told Cindy Wainwright she did not think that was proper. This argument continued in email exchanges between Wainwright and Ellis at least until July 24, 2018, when Relator was discharged from her position. In spite of the questioning by Ms. Ellis, Wainwright did not change the corporate billing practice for services performed at ODC but continued to have her team intentionally bill payors across state lines over the internet for services rendered at the ODC at hospital rates.

***Non-Collection of Co-Payments or Deductible***

---

[32] *Id.*

136.    Vanessa Ellis, the office manager, also frequently violated federal regulations by establishing a policy of not collecting co-payments or deductibles from patients.[33] Part of Relator's job was to audit the ODC on daily patient intake. This meant she was examining the ODC patient list every day from the day Relator started until July 24, 2018. In Ms. Newby's audits, she observed the ODC saw between 1000 and 1300 patients per month. In Relator's audits she observed no co-pay was collected up-front from the overwhelming majority of the patients. Most of the patients from whom no co-pay was collected were Medicare or Medicaid patients. There was no proof supplied that the patients from whom no co-payment or deductible was collected were either indigent or that it would cause financial hardship to satisfy the co-payment or deductible required. Indeed, to Relator's knowledge, there was no corporate policy requiring proof of indigency. Once the procedure was performed at the ODC there was very little follow-up by Cindy Wainwright's team to collect the co-pay after the services were performed.  The practice and policy of the ODC was to routinely discount or waive the patient's copayment or deductible obligations without any proof of indigency, in violation of 42 C.F.R. §1001.952(h)(5)(iv). "Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare."[34] Based on an article she had read, Relator advised Cindy

---

[33] See, e.g. Exhibit 4.

[34] Department of Health and Human Services, *Publication of OIG Special Fraud Alerts* (Dec. 19, 1994), https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html (indicating that although this particular fraud alert addresses Medicare Part B reimbursement, Part A violations of a similar nature are also susceptible under the AKS).

Wainwright this appeared to be similar to a case in Houston where a hospital had been sued and gone bankrupt for failing to collect copayments or deductibles or waiving those copayments or deductibles from patients. Wainwright told Ms. Newby she would speak to Defendants Danishmund and Haire regarding this matter. Despite Relator's warning, this practice continued and the ODC continues, as a routing policy, to not collect copayments or deductibles from patients.

137.    Finally, the ODC upcoded and billed for more services than were performed. Billing for the ODC was done by Drew Barsch. He would submit bills on behalf of the ODC across state lines using paper claims and sending through the United States Postal Service or similar carrier and/or electronically via the internet for services not provided. For example, he would bill for mammograms of two breasts when a mammogram of only one breast had been run, or bill for a CT with contrast when the CT was run without contrast. He even twice billed for one thousand MRIs allegedly performed on a single patient. Relator learned about this upcoding and excessive billing when she was asked by Defendant Julie Haire to look at the ODC billing in early April 2018. She was shown a spreadsheet detailing the services ODC performed from October 2017 through January 2018 for patients versus what Drew Barsch billed for the services, and was specifically asked by Defendant Haire whether it looked like Defendant Barsch was upcoding. After auditing the spreadsheet and comparing the services actually performed to the charges actually billed by Defendant Winnie Community Hospital, LLC, Ms. Newby reported back in person to Defendant Haire that she was 100% sure Defendant Barsch was upcoding. Most of the charges for which Defendant Barsch was upcoding were being billed to and paid by the United States government. Defendant Julie Haire and the corporate Defendants had actual knowledge that Defendant Winnie Community Hospital, LLC, had billed the United States for services not performed. Despite the knowledge it was in possession of money from the United States to which

it was not entitled, to Relator's knowledge Winnie Community Hospital, LLC and its corporate executives never repaid the United States government.

138.    After careful consideration, that weekend Relator contacted an attorney. Relator continued to work at her job, performing the tasks she was directed to perform, until her termination 10 days later.  On July 24, 2018, shortly before lunch, Ms. Newby was called into the conference room and told Riceland Healthcare Services and/or Winnie Community Hospital LLC was invoking its rights in an at-will state to let her go because she was not a good fit with the corporation. Ms. Newby, who only weeks before had been given a stellar review and a bonus for her quality work,[35] was unceremoniously fired within days of uncovering and reporting to the highest-level officers in the Defendant corporations, significant corporate and individual misconduct and fraud.

---

[35] Defendant Danishmund had been injured in June and was out of the office much of the month. Ms. Newby had filled in for him, handled some important financial matters and had brought in a significant check for the corporation. Danishmund told Ms. Newby she had done good work and promised her a bonus for her hard work. When the bonus was not included in her subsequent pay check, on June 25, 2018, Ms. Newby texted Defendant Danishmund inquiring about the status of the bonus. Danishmund responded that day: "Damn it. You will receive it today."

**Worthless and Non-Existent Services that Lacked Medical Necessity Scheme**

### *Riceland Imaging Center Billing Scheme*

139.    Located at 390 North 11th Street in Beaumont, the Riceland Diagnostic Imaging Center (RDIC) is located several miles from Winnie Community Hospital in Winnie, Texas.[36] The RDIC according to its webpage, "specializes in imaging and radiology services".[37] It offers a state of the art stand-up MRI scanner and 2 high resolution CT machines.[38] The cost for the vast majority of the testing performed at the RDIC was billed to the United States of America.

140.    From the start of Relator's tenure with Winnie Community Hospital, LLC, Defendant Cindy Wainwright knowingly and intentionally billed the United States and other payors for the tests performed at the RDIC at hospital rates, even though the tests were performed at an outpatient facility in a metropolitan area. Relator learned of this billing scheme shortly after she started work with Winnie Community Hospital in March 2018, when Defendant Cindy Wainwright told her. Although Cindy Wainwright knew from her conversations with Vanessa Ellis that it was of questionable legality to bill at hospital rates for services performed at an outpatient facility. Despite the questioning by Ms. Ellis, Wainwright did not change the corporate billing practice for services performed at RDIC but continued to have her team intentionally bill payors

---

[36] https://www.mapquest.com/directions/from/us/texas/winnie-community-hospital-9557236/to/us/tx/beaumont/77702-1802/390-n-11th-st-30.084303,-94.129786 (last viewed August 9, 2018).

[37] http://www.ricelandhealthcare.com/riceland-diagnostic-imaging-center/ (last viewed August 9, 2018).

[38] *Id.*

across state lines using paper claims and sending through the United States Postal Service or similar carrier and/or electronically via the internet for services rendered at the RDIC at hospital rates. The Government received bills sent across state lines from Winnie Community Hospital billing at hospital rates, and the Government paid those bills. Had the Government known the radiological services were rendered at an outpatient clinic in a metropolitan area that did not meet the requirements of 42 C.F.R. § 485.610, the Government would not have paid hospital rates. Not only did Winnie Community Hospital, LLC knowingly and intentionally bill outpatient treatment at the RDIC at hospital rates, but Winnie Community Hospital has knowingly retained the money paid by the Government and not repaid the overpayment.

### *The Transcure, LLC Billing Scheme*

141.    When Kristian Newby joined Winnie Community Hospital, LLC, the billing for the Surgery Center was being handled by a team of Transcure LLC employees located in Pakistan lead by Qaiser Raza. Prior to that, it was handled by AB&C Billing Consultants.

142.    At the end of April of 2018 there was a meeting attended in person by Relator, Mohammed Danishmund and Julie Haire. Cindy Wainwright participated by phone, as did Qaiser Raza.

143.    The purpose of the meeting was to discuss billing from the Surgery Center and significant discrepancies in the billing that had been discovered. Cindy Wainwright had discovered, and Relator had confirmed, that Raza and his team in Pakistan would take claims that had been rejected by the Government and private payors because there was either no medical necessity for the service or the Government did not pay for that particular procedure, change the diagnostic codes on the claim to reflect a procedure for which payment would be made, and re-submit the claim. As a result of the re-submission Wainwright and Newby had discovered that the

Government, as well as private payors, had been paying for procedures at the Surgery Center that in fact were never performed.

144.    Initially Raza denied engaging in this conduct. Relator was prepared for the denial. She had brought with her to the meeting a report from a spinal procedure performed at the Center and a log from Eprimus showing Raza had entered the program, changed the diagnostic code, re-submitted the claim and it was paid. Despite knowing they were in possession of Government overpayments, Defendants have not refunded the Government.

### *The Houston Premier Radiology Billing Scheme*

145.    Located at 12853 Gulf Freeway in Houston, Texas, Houston Premier Radiology, Inc. ("Houston Premier") is an outpatient facility that specializes in imaging and radiology services, including MRI and CT Scans, X-rays, ultrasounds and bone density measurements. It also offers EMGs and nerve conduction velocity testing. On information and belief Houston Premier's NPI is 1255624847. The cost for the vast majority of the testing performed at Houston Premier was billed to the United States of America and the State of Texas.

146.    In July 2018 Relator examined billing from Houston Premier inside the program CollaborateMD. She discovered that Winnie Community Hospital, LLC, was being listed as the ordering provider, supervising provider and billing provider, and claims were being billed under Winnie Community Hospital, LLC's NPI. Further, Winnie Community Hospital, LLC was billing the Government for services rendered at Houston Premiere at hospital rates, even though the tests were being run at an outpatient facility in Houston, Texas. The billing was being done by Defendant Drew Barsch and the decision to use hospital rates was set by Defendant Cindy

Wainwright and/or Karen Horn, as they were the only two based on Relator's experience with authority to set the billing rates. Not only did Winnie Community Hospital, LLC knowingly and intentionally bill outpatient treatment rendered at Houston Premier at hospital rates, Winnie Community Hospital, LLC has kept the overpayment made by the Government and not reimbursed the overpayment.

### *The Last Straw*

147.    On Saturday, July 14th Relator spoke with L.S., a friend and former colleague at Riceland Healthcare Services. During the conversation L. S. told Ms. Newby about her mother, who was a resident at the Arboretum Nursing Home in Winnie, Texas, and that earlier she began to receive bills from Winnie Community Hospital and/or Riceland Healthcare Services for visits her mother allegedly received from Defendant Gregory Gray. L.S. told Relator there was a specific order in her mother's chart stating no one could see her mother without permission of her mother's treating doctor or the family. There was no medical authorization for Defendant Gray to treat L.S.'s mother[39] and the family had never given him permission.

148.    Further, L.S. told Newby that to the best of her knowledge, Defendant Gray never actually saw her mother. The reason L.S. knew this is because she obtained a copy of her mother's chart and there were no progress notes reflecting a visit by Defendant Gray.

149.    The last straw for Kristian Newby came with the one additional piece of information L.S. imparted. Relator knew that at the end of May 2018 the Arboretum had contacted the management of Winnie Community Hospital, LLC/Riceland Healthcare Services and informed

---

[39] Riceland Healthcare Services and/or Winnie Community Hospital LLC employee and physician's assistant Danny Thompson confirmed this to Newby on July 17th.

Defendants the four nurse practitioners in the IOP were banned from coming on the campus of the Arboretum and treating residents as a result of unnecessary treatment and billing for that treatment.

150.    What Ms. Newby learned that shocked her was that some time prior to the end of May, Danny Thompson had issued a standing order applicable to the residents of The Arboretum. That Order expressly stated that residents would only be visited if there was a request for consultation written or ordered by either Dr. Boutte or Danny Thompson (Exhibit 5).  That order apparently had been followed only in the breach, leading the Arboretum to ban the nurse practitioners from coming on its campus. That also meant that every charge billed for services rendered by the four nurse practitioners in the Intensive Outpatient Program for some time prior to the end of May 2018 was for services that were not medically necessary, had not been requested by the families and were not authorized by the attending physicians. After all she had learned, especially in the past month, and the lackluster response of management to the fraud she had revealed and disclosed, Relator picked up the phone and contacted an attorney.

**VII. <u>THE ILLEGAL RETALIATION IN VIOLATION OF SECTION 3730(h)</u>**

151.    Until June 26, 2018, Ms. Newby was regarded as an exemplary employee. For example, on June 7, 2018, she received a text message from Shuia Mohammad, Chief Marketing Officer, stating "[Relator] is held in high regards by all there and [Relator is] doing great handling stuff." On June 20, 2018, she received a text from Mohammed Danishmund, the Chief Financial Officer ("CFO"), stating that he was "proud of [her]." Two days later, on June 22, 2018, Ms. Newby was given a bonus of $461.75 and was told by the CFO that "[she] would always have a place among Riceland and would never have to want for a job."

152.    June 26, 2018 is the date the attitudes toward Relator began to change. It was on that date she learned Dale Brock, one of the nurse practitioners, had billed for treating a dead

person (Exhibit 6), and she had brought that fact to the attention of Chief Financial Officer Defendant Mohammed Danishmund.

153.    From June 27, 2018 until her termination on July 24, 2018, Ms. Newby continued to engage in protected activities by bringing issues related to the filing of false claims and the knowing retention of overpayments to the attention of various Defendants. A few examples of her efforts include:

- **June 27, 2018**: Relator was called into Defendant Danishmund's office about the nursing home billing discrepancies. As she began to voice her concerns, Defendant screamed for the senior accountant, Asiad Mooeni to sit in on the discussion. Ms. Newby relayed that billing discrepancies were the norm for the nurse practitioners at the nursing homes. She told him that Ms. Steele had additional proof to back up the discrepancies.

- **July 3, 2018**: Relator was questioned by Saad Javeed, Chief Operating Officer ("COO") about the auditing actions pertaining to the nursing home billing discrepancies and specifically requested to investigate and provide additional evidence.

- **July 8, 2018:** Relator emailed the Saad Javed and attached a report with examples of the nursing home billing issues related to the nurse practitioners in the IOP.

- **July 9, 2018:** Relator met with the Saad Javed and detailed what she had found in her audit of only 30 files. Javed then called his father, Defendant Muhammad Tahir Javed, the CEO of Defendants, and after that conversation directed the Relator to be available at 1:30 PM for a meeting with the attorney and the CEO. At around 3:30 PM Saad Javed called her office phone and asked her to walk down to his office and speak with the external corporate attorney. Relator met with Saad Javed and the attorney, Chris Portner.

- **July 10, 2018:** Relator asked the COO if she could audit the over 21,000 + claims billed by the nurse practitioners in the Intensive Outpatient Program that she had Karen Horn pull. After auditing only 30 of those claims she had found 14 questionable accounts. The Saad Javed told Ms. Newby that administration was looking into the issue.

- **July 11, 2018:** Relator was asked by Legal Compliance Officer, Inigo Soriano, to come into the conference room upon returning from a meeting at the Winnie Community Hospital. Later that day, Relator received a call from Mrs. Walthall, who complaint about Defendant Gregory Gray seeing her husband after he was told not to. Mrs. Walthall stated that Defendant ignored the request and she had been billed numerous times after the fact. Relator asked Mrs. Walthall to provide a detailed email setting out the facts. Mrs. Walthall did so, and Relator forwarded the email to Mr. Danishmund.

For her efforts to solve a problem, Relator encountered retaliation and finally termination.

- **July 12, 2018:** Relator was called into the conference room to meet with Julie Haire and Mr. Danishmund. Ms. Newby was blindsided when she received disciplinary actions regarding: 1) Failure to follow the chain of command 2) Inappropriate and confrontational interactions with other staff. Relator had not received a verbal warning prior to the written reprimand and was expressly told to cease her investigation into the IOP.

- **July 13, 2018**: Relator responded to the disciplinary allegations. Later that day, she was told by Julie Haire to avoid any job-related activities related to nursing homes and skilled nursing facilities. Relator told Ms. Haire that Pelican Bay stated that there are no physician orders to see patients for psychiatric or behavioral related issues.

154.    Ultimately, on July 24, 2018, Ms. Newby was summoned by Defendant Haire into a conference room, which was located between the offices of the CEO and CFO. Ms. Newby was surrounded and terminated. Ms. Haire further demeaned Relator by "perp walking" her to her office and hovering over her, as she gathered her belongings. Ms. Newby asked why Ms. Haire was treating her in a manner that had never been policy before when Riceland ended its relationship with others.  Ms. Haire stated, "it's policy."

## VIII. CAUSES OF ACTION

**COUNT I**
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(A) – (B))**

155.    Relator and Plaintiffs repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

156.    Defendants engaged in interstate commerce when the invoices, which are material, were submitted to the U.S. Government through either the United States mail and/or electronic submission via the internet.

157.    Through the acts and inaction alleged above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

158.    Through the acts and inaction alleged above, Defendants knowingly made, used, or caused to be made or used, false or fraudulent records and statements material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

159.    Defendants violated the federal False Claims Act by submitting, or causing to be submitted, claims for reimbursement from federal health care programs, including Medicare and Medicaid, knowing that those claims were ineligible for the payments demanded.

160.    Each claim written as a result of the Defendants' illegal conduct represents a false or fraudulent record or statement.

161.    Each claim for reimbursement for illegally induced CMS Form 1500 or CMS Form UB-04 service and/or supply submitted to a federal health insurance program represents a false or fraudulent claim for payment.

162.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused.  The false claims were presented by thousands of separate entities, and over many years.  Relators have no control over, or dealings with, such entities and have no access to the records in their possession.

163.    The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

164.    By reason of Defendants' acts, the United States has been, and may continue to be, damaged in a substantial amount to be determined at trial.

165.    Additionally, the United States is entitled to the maximum penalty for each and every false and fraudulent claim made and caused to be made by Defendants arising from its unlawful conduct as described herein.

166.    All of the Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

### COUNT II
### Violations of 31 U.S.C. § 3729(a)(1)(A)

167.    Relator and Plaintiffs repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

168.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq*., as amended.

169.    During the relevant period, Defendants knowingly presented numerous claims for payment to the United States Government through the Federal Programs.

170.    For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the FCA.  More specifically, Defendants knowingly presented, and caused to be presented, to an officer and/or employee of the United States Government false and fraudulent claims for payment and approval in violation of 31 U.S.C. § 3729(a)(1)(A).

171.    Defendants had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

172.    The United States suffered damages as a result of false claims by Defendant and is entitled to recover its losses and otherwise obtain relief available under the FCA.

### COUNT III
### Violations of 31 U.S.C. § 3729(a)(1)(B)

173.    Relator and Plaintiffs repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

174.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

175.    Defendants have presented tens of thousands of records and statements to the United States Government through a variety of government programs, including but not limited to Medicare, Medicaid and TRICARE.

176.    For the reasons alleged herein, many of these records and statements were knowingly false and fraudulent within the meaning of the False Claims Act. More specifically, Defendants knowingly made, used and caused to be made and used, false records and statements to get false and fraudulent incentive payments/grants, as well as claims paid and approved, by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

177.    Defendant had actual knowledge of the falsity of these statements, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

178.    The United States suffered damages as a result of false records and statements by Defendant and is entitled to recover its losses and otherwise obtain relief available under the FCA.

### COUNT IV
### (False Claims Act, 31 U.S.C. § 3729(a) (1) (2006))
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(G) (West 2013))

### Knowing Retention of Overpayments

179.    Relator and Plaintiffs repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

180.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq*., as amended.

181.    During the relevant period, Defendants presented numerous claims for payment to the United States Government through Medicare, Medicaid and TRICARE, as well as other payors; and, knowingly retained the overpayments in violation of 31 U.S.C. § 3729(a)(1)(G) when Defendants failed to repay the money within 60 days.

182.    For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the FCA. More specifically, Defendants knowingly withheld, and caused to be withheld, to an officer and/or employee of the United States Government false and fraudulent claims for which payment and approval had been received in violation of 31 U.S.C. § 3729(a)(1)(G) when Defendants failed to repay the money within 60 days.

183.    Defendants had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

184.    The United States suffered damages as a result of the reverse false claims that were knowingly retained by the Defendants and is entitled to recover its losses and otherwise obtain relief available under the FCA.

### COUNT V
### (Conspiracy in Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(C))

185.    Relator and Plaintiffs repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

186.     This is a claim for treble damages and penalties under the False Claims Act, 31 USC § 3729, *et seq.*, as amended.

187.     Through the acts and inaction alleged above, Defendants, acting together in concert as each other's contractors, agents, partners, and/or representatives in making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or in concealing, avoiding or decreasing an obligation to pay or transmit money to the United States, were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein and conspired to engage in actions and inactions in violation of the False Claims Act.

188.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

189.     Additionally, the United States is entitled to the maximum penalty for each and every false record or statement made through Defendants' conspiracy to defraud the United States.

### COUNT VI
### (60-day Rule, Affordable Care Act, Section 6402(a); 42 CFR § 401.305
### Concealing or Avoiding Obligation to Pay)

190.     Relator and Plaintiffs repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

191.     This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

192.     During the relevant period, Defendant presented numerous claims for payment to the United States Government through Government Programs, as well as other payors.

193.     For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the FCA. More specifically, Defendant knowingly withheld, and

caused to be withheld, to an officer and/or employee of the United States Government false and fraudulent claims for which payment and approval had been received in violation of Affordable Care Act, Section 6402(a); 42 CFR § 401.305, when Defendant failed to repay the money within 60 days. Defendant had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

194.    The United States suffered damages as a result of false claims by the Defendant and is entitled to recover its losses and otherwise obtain relief available under the FCA.

## COUNT VII
### (Retaliation of the Relator in Violation of the False Claims Act –31 U.S.C. § 3730(h))

195.    Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if set forth fully herein.

196.    Defendants violated the False Claims Act, 31 U.S.C. § 3730(h), by terminating Ms. Newby's employment due to her refusal to participate in and perpetuate Defendants' schemes and unlawful acts to submit or cause to be submitted, claims to the federal health care programs that were paid by the United States and the State of Texas in violation of the False Claims Act.

197.    In response, Defendants singled out Ms. Newby for criticism and disciplinary action, harassed her, and ultimately terminated her.

198.    Defendants' wrongfully retaliated against Ms. Newby for investigating and reporting the non-compliance with the Social Security Act and Medicare Regulations, knowing that such violations and claims for payment from the United States and the State of Texas would result in false claims under the False Claims Act.

199.    As a direct and proximate result of Defendants' conduct, Ms. Newby has suffered damages in a substantial amount to be determined at trial.

**COUNT VIII**
**Texas Medicaid Fraud Prevention Act**
**(Tex. Hum. Res. Code Ann. § 36.002(1), (2), (4) B and (7))**

200.    Relator and Plaintiffs repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

201.    This is a claim for double penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001, *et seq*.

202.    Through the acts and inaction alleged above, Defendants violated and continue to violate Texas law by knowingly making, causing to be made, inducing, or seeking to induce the making of false statements or misrepresentations of material fact.

203.    Through the acts and inaction alleged above, Defendants engaged in unlawful acts and knowingly presented, or caused to be presented, false or fraudulent claims to officers, employees or agents of the State of Texas.

204.    Through the acts and inaction alleged above, Defendants knowingly made, used, or caused to be made or used, false or fraudulent records and statements, material to false or fraudulent claims, to induce the State of Texas to approve or pay such certifications and claims submissions.

205.    The State of Texas, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid claims that would not be paid but for Defendants' unlawful conduct.

206.    As a result of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Additionally, the State of Texas is entitled to the maximum penalty for each and every unlawful act and false and fraudulent claim made and caused to be made by Defendants arising from its unlawful conduct as described herein.

## COUNT IX
## The Texas Medicaid Assistance Program and the Texas
## Patient Solicitation Act
## (Tex. Hum. Res. Code Ann §32.039(b), (b)(1-a), Tex. Occ. Code Ann. § 102.001)

207.    Relator and Plaintiffs repeat and reallege each allegation in each of the preceding paragraphs as if fully set forth herein.

208.    This is a claim for double penalties under the Texas Medicaid Assistance Program and the Texas Patient Solicitation Act.

209.    By virtue of the acts described above, the Defendants have violated and continue to violate Texas Law by engaging in unlawful acts, paying kickbacks and knowingly making, causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of material fact.

210.    By virtue of the acts described above, Defendants knowingly engaged in unlawful acts and presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

211.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or uses false records and statements, and omitted material facts, to induce the Texas State Government to approve or pay such false and fraudulent claims.

212.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or cause to be made, used or presented by defendants, paid and continued to pay the claims that are non-payable as a result of the Defendants' illegal actions.

213.    By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

214.    The State of Texas is entitled to recovery of up to twice the amount of damage sustained by the State, plus a civil penalty range set forth by the False Claims Act. If the unlawful

act resulted in an injury to someone who is elderly, disabled or under 18, penalties are assessed in the range of $5,500 to $15,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants. For all other individuals, penalties are up to $10,000 per false or fraudulent claim.

### COUNT X
### Unjust Enrichment

215.    Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

216.    Defendants were unjustly enriched by engaging in unlawful acts and knowingly and intentionally submitting false claims, and are liable to account and pay such amounts, which are to be determined at trial, to the United States and the State of Texas.

### VIII.  DAMAGES AND PENALTIES

217.    Plaintiffs and Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

218.    Plaintiffs and Relator seek all actual damages caused by Defendants violations of the federal False Claims Act in an amount to be proved at trial and ask that those damages be trebled as required by the statute.

219.    Plaintiffs and Relator seek the penalties as provided for by the federal False Claims Act up to the maximum amount allowed by law for each of Defendants' violations of the False Claims Act.

220.    Plaintiffs and Relator seek all actual penalties caused by Defendants violations of the Texas Medicaid Fraud Prevention Act, Medicaid Assistance Program and Texas Patient

Solicitation Act in an amount to be proved at trial and ask that those penalties be doubled as required by the statutes.

221.    Plaintiffs and Relator seek penalties as provided for by the Texas Medicaid Fraud Prevention Act, Medicaid Assistance Program and Texas Patient Solicitation Act, up to the maximum amount allowed by each of those statutes for each of Defendants' violations of the Texas Medicaid Fraud Prevention Act, Medicaid Assistance Program and Texas Patient Solicitation Act.

222.    Plaintiffs and Relator seek all equitable relief to which they are entitled, in an amount to be proved at trial, due to Defendants' unlawful conduct that constitutes unjust enrichment.

223.    Relator seeks all actual damages in an amount to be proved at trial caused by her unlawful termination under the federal False Claims Act.

224.    Plaintiffs and Relator seek all costs of this action, including attorneys' fees and expenses.

## IX.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs/Relator prays for judgment as follows:

A.    That Defendants each be ordered to cease and desist from violating 31 U.S.C. §3729 *et seq*.;

B.    That this Court enter judgment against Defendants in an amount equal to treble (three times) the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of 31 U.S.C. § 3729 prior to November 2, 2015;

C.    That this Court enter judgment against Defendants in an amount equal to treble (three times) the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $10,781.00 and not more than $21,563.00 for each

violation of 31 U.S.C. § 3729 after November 2, 2015, pursuant to 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016);

D.     That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the federal False Claims Act;

E.     That this Court enter judgment against Defendants and in favor of Relator for Defendants' violation of §3730(h) of the federal False Claims Act and that Relator be awarded the maximum amount allowed pursuant to §3730(h) of the federal False Claims Act;

F.     That this Court enter judgment against Defendants in an amount equal to double (two times) the amount of penalties the State of Texas has sustained because of defendants' actions caused by Defendants violations of the Texas Medicaid Fraud Prevention Act, Medicaid Assistance Program and Texas Patient Solicitation Act;

G.     That Relator be awarded the maximum amount allowed for her prosecution of this action pursuant to Tex. Hum. Res. Code Ann. Section 36.001, *et. seq*. and any other provision of the Texas Medicaid Fraud Prevention Act, Medicaid Assistance Program and Texas Patient Solicitation Act;

H.     That this Court enter judgment against Defendants for all equitable relief to which Plaintiffs and Relators are entitled due to Defendants' conduct that constitutes unjust enrichment;

I.      That this Court enter judgment against Defendants ordering Defendants to pay Relator, her attorney, the United States Government and its attorneys and the State of Texas and its attorney all costs of this action, including attorney's fees and expenses; and

J.     For such other and further relief as this Court may deem proper.

## X.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all

claims and issues so triable.

Dated: June 9, 2019.

Respectfully Submitted,

RACHEL V. ROSE – ATTORNEY AT LAW, PLLC

By: _/S/ RACHEL VERONICA ROSE_____
Rachel Veronica Rose
TX State Bar No. 24074982
P.O. Box 22718
Houston TX 77227
Telephone: (713) 907-7442
 rvrose@rvrose.com

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(c), as well as the False Claims Act, the United States Attorney General, United States Attorney for the Eastern District of Texas and the Texas Attorney General were provided with a copy of this sealed Second Amended Complaint and the accompanying Exhibits via Certified Mail on or about June 10, 2019, after a file-stamped copy was received by Rachel V. Rose, Esq..

_/s/ Rachel Veronica Rose, Esq._